**UTILITY TRAILER MANUFACTURING COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 1439-60-WM.**

United States District Court
S. D. California,
Central Division.

Dec. 28, 1962.

Mackay, McGregor & Bennion and Robert M. L. Baker, Los Angeles, Cal., for plaintiff.

Francis C. Whalen, U. S. Atty., Walter S. Weis and Loyal E. Keir, Asst. U. S. Attys., Los Angeles, Cal., for defendant.

JAMESON, District Judge.

This is an action for the recovery of federal income tax deficiencies paid by plaintiff for the fiscal years ending September 30 in 1954, 1955, 1956, 1957, and 1958. Deficiencies in the aggregate amount of $165,875.86 were assessed. Plaintiff paid the deficiencies plus interest on January 4, 1960, and on March 29, 1960, filed claims for refund. The Commissioner of Internal Revenue had taken no action on the claims when this action was commenced on December 29, 1960.

On the basis of stipulations in the pretrial order, the exhibits received in evidence, and oral testimony at the trial, the court makes the following findings of fact:[1]

## FINDINGS OF FACT

1. Plaintiff was incorporated on June 18, 1916, under the name of "Los Angeles Trailer Company", with an authorized capital stock of 500 shares. On or about May 24, 1921, the name of the corporation was changed to "Utility Trailer Manufacturing Company". Its principal place of business is in the city of Industry, California.

2. In accordance with the method of accounting employed in keeping plaintiff's books and records, which, insofar as here pertinent, was the accrual basis, plaintiff within the time prescribed by law filed its federal income tax returns for its fiscal years ending September 30 in each of the years 1954, 1955, 1956, 1957, and 1958.

---

1. Most of the basic findings of fact proposed by both parties, without the inferences or conclusions drawn therefrom, have been adopted as a basis for discussion in determining the ultimate facts and conclusions of law.

Upon an audit of its returns, the Commissioner of Internal Revenue determined deficiencies which, with interest, were paid by plaintiff to the District Director of Internal Revenue on January 4, 1960, in the total sum of $192,404.54. The amounts of the deficiencies and interest for each fiscal year ending September 30 are as follows:

| | Deficiency and Tax | Interest |
|---|---|---|
| 1954 | $18,458.79 | $5,546.93 |
| 1955 | 28,404.46 | 6,831.07 |
| 1956 | 36,144.18 | 6,523.77 |
| 1957 | 43,569.21 | 5,249.78 |
| 1958 | 39,299.22 | 2,377.33 |

3. On or about March 29, 1960, within the three-year period prescribed by Section 6511(a) of the Internal Revenue Code of 1954, plaintiff filed with the District Director of Internal Revenue claims for refund in the amounts shown in the preceding finding.

4. None of the claims for refund has been disallowed by the Secretary of the Treasury, or his delegate, as prescribed by Section 6532(a) (1) of the Internal Revenue Code of 1954. More than six months have elapsed from the date of filing each claim for refund. No assignment or transfer of the claims has been made.

5. The history of plaintiff's issuance of its capital stock is as follows:

| | | Shares Outstanding Common |
|---|---|---|
| 6/17/16 — Authorized: | | |
| | 500 Sh. $100 Par | |
| 11/18/16 | Original issue | 84 |
| 12/31/16 | Total issued | 105 |
| 12/31/17 | Total issued | 186 |
| 12/31/18 | Total issued | 206 |
| 12/31/25 | Total issued | 304 |
| 12/31/48 | Total issued | 313 |
| 6/20/49 — Authorized: | | |
| | 10,000 Sh. $100 Par | |
| 9/28/49 | Stock Dividend—3443 Sh. | |
| 9/30/49 | Total issued | 3,756 |
| 4/1/54 | Issued for notes—42 Sh. | |
| 9/30/54 | Total issued | 3,798 |
| 7/18/55 — Authorized: | | |
| | 10,000 Sh. Pfd. $100 Par; 10,000 Sh. Com. $100 Par | |
| 8/18/55 | Exchange of 1,788 Sh. Com. for 5,811 Sh. Pfd. | |

| | | Shares Outstanding | |
|---|---|---|---|
| | | Common | Preferred |
| 9/30/55 | Total issued | 2,010 | 5,811 |

5/2/58 — Authorized on Recapitalization:

10,000 Sh. Pfd. $100 Par
200,000 Sh. Class A Com. $5 Par;
(20–1 split of old Com.);
40,000 Sh. Class B Com. $5 Par

| | | Class A | Class B | Preferred |
|---|---|---|---|---|
| 9/30/58 | Total issued | 40,200 | 543 | 5,811 |

The total par value of plaintiff's issued and outstanding stock as of September 30, 1958, was approximately $798,000.00. This consisted of stock issued for cash of approximately $52,000.00 and capitalized earned surplus of $746,-000.00. Plaintiff paid nontaxable stock dividends in 1949 and 1955 to the extent of $344,000.00 and $402,000.00, respectively.

6. Plaintiff is in the manufacturing business. It is America's oldest trailer builder. It makes a complete line of commercial heavy duty trailers, including flat beds, van boxes and refrigerator trailers. Most of the equipment is custom built. Prior to 1938 it manufactured primarily the chassis for trailers. In order to meet competition, it built its own body shop in 1938. Plaintiff also has a foundry, which it acquired in 1933. The foundry has been operated at a separate location. At the time of its advent into body manufacturing in 1938 plaintiff had about 175 to 200 employees. As of September 30, 1953, it had between 700 and 800 employees.

7. Plaintiff sells to transportation companies and other companies using freight hauling equipment. Sales are handled through separate distributing companies. The principal sales offices are located in Los Angeles, San Diego, San Francisco and Phoenix. Other sales offices are located in various cities in California, as well as in Portland, Oregon; Seattle, Washington; Denver, Colorado; Salt Lake City, Utah; Dallas and San Antonio, Texas; and Boise, Idaho. The Los Angeles distributor, the largest, is owned by the Bennett family, which owns the controlling interest in plaintiff. Plaintiff has a stock interest in several of the companies, including approximately a one-third interest in the San Francisco distributor. It has also had a distributor in Hawaii for many years, and its sales have extended to South America and New Zealand.

8. When plaintiff began its operations, the trailer manufacturing business was in its infancy. In general, the growth of the trailer industry has paralleled the growth of the trucking industry.

During the World War II years of 1942 to 1945 plaintiff was largely in government work, building trailers for the Armed Services, most of which was on a cost-plus-fixed-fee basis.

A great demand for truck trailers developed within a few years after the end of World War II. This was particularly noticeable in 1948 when plaintiff began having difficulty meeting the pent-up demand. The demand fell off in 1949, but built up again rapidly during the Korean War. The years 1950 through 1952 were exceptionally good years. In 1951 and 1952 plaintiff had to allocate trailers to its distributors because it could not fill all of the orders. Although plaintiff dispensed with its allocation after 1952, the great demand for trailers still continued.

9. In addition to several companies based in the West, plaintiff's principal competition consists of four national companies with western branches. In point of sales plaintiff ranks between fifth and tenth nationally, and ranks first among the western based companies. It is second in volume of sales in the eleven western states.

10. Capital is an important factor in the trailer business. In order to meet competition successfully, plaintiff has been forced to invest "a lot of money" in plant and equipment. Meeting competition, as well as the demands of the business, has required continuous expansion. Plaintiff has had to increase constantly both its working capital and its fixed investments in order to grow and compete. Plaintiff has "ploughed back practically all of the earnings in the company", except for approximately $7,500.00 per year. The expansion in 1954 and 1955 was part of that continuous process, and plaintiff's need for capital has continued to the present time.

11. In obtaining funds for operation plaintiff borrowed from the usual commercial channels such as banks. Beginning around 1940, it also obtained funds from its stockholders and key employees,

for which it issued instruments in the form of promissory notes. The outstanding balances of these notes, where the maturity dates exceeded one year, at the close of each fiscal year from 1941 to 1948, were as follows:

| Fiscal Year Ended 9/30 | Balance |
| --- | --- |
| 1941 | $ 65,000.00 |
| 1942 | 101,760.00 |
| 1943 | 158,860.00 |
| 1944 | 213,400.00 |
| 1945 | 253,500.00 |
| 1946 | 309,100.00 |
| 1947 | 355,700.00 |
| 1948 | 367,500.00 |

Plaintiff made it a practice to confine its long-term borrowings to loans from stockholders, employees, and relatives of stockholders. Its bank loans were restricted to current financing. In borrowing from employees, plaintiff encouraged the "department heads and younger people in the company who were showing great promise, if they had any funds, to invest. (Plaintiff) would prefer they invest in the company rather than outside. (Plaintiff) wanted their undivided interest." Plaintiff made no effort at any time to borrow from a commercial lender in order to pay off the stockholder-noteholders.

During the years 1940 through 1947 the stockholder loans were carried on plaintiff's balance sheets as "Optional Liabilities" under "Net Worth".

12. On September 30, 1949, plaintiff called in for cancellation the notes referred to in Finding 11, then aggregating $367,500.00, with maturity dates from September 30, 1954, to September 30, 1957. New unsecured promissory notes were issued in lieu thereof in the same total sum, with maturity dates from September 30, 1959, to September 30, 1966. On October 31, 1952, these notes were exchanged for new "Registered Convertible Notes", bearing corresponding serial numbers, face value, interest rates, due dates, and conversion rates. These notes contained an option on the part of the holder to convert them into stock.

13. In 1949 plaintiff decided that its plant facilities were inadequate and began looking for a suitable site for the purpose of erecting a modern plant. A site was found in 1952. Substantial funds were required for construction. Plaintiff considered the possibility of finding an institution which would construct the plant and lease to plaintiff, but concluded this would be too expensive. After negotiating with various loaning agencies, it was found that a long-term loan from an insurance company would be most feasible. It was found also that in order to acquire the long-term financing some arrangement would have to be made with the noteholders. About $195,000.00 of these notes were coming due in 1953 to 1956 and the long-term notes aggregating $367,500.00 were coming due from 1959 to 1966. The noteholders were then approached by Mr. Knox, vice president in charge of finances, to find out if they would agree to extend or subrogate their notes, or convert them for stock, so that plaintiff could obtain the long-term financing. The noteholders refused to do either.

14. In 1953 plaintiff learned of an inflation-type provision note used by a Chicago company and secured a copy thereof. This type of note seemed to answer most of the objections of the noteholders, whereupon an agreement between plaintiff and its noteholders was reached. All but two of the holders of the notes agreed to exchange their notes for Registered Inflation Provision Notes.

15. After the issuance of the Registered Convertible Notes, described in Finding 12, plaintiff continued to borrow additional sums from its key employees and shareholders, giving unsecured notes payable on or before three years after date and bearing interest at 6%. On April 1, 1954, there was outstanding $195,300.00 of these notes, with maturity dates from October 1, 1953, to December 31, 1956, making a total indebtedness of $562,800.00 to key employees and stockholders.

16. Under date of April 1, 1954, plaintiff issued new notes in the total sum of $557,700.00, containing escalator provisions based on fluctuations in the consumer price index as a hedge against inflation, with maturity dates from September 30, 1965, to September 30, 1972. These notes were issued in exchange for the outstanding Registered Convertible Notes of $362,400.00 and straight notes of $195,300.00 referred to in Findings 12 and 15. Two of the Registered Convertible Noteholders converted their notes totalling $5,100.00 into plaintiff's common stock, in accordance with the option contained in the notes.

The Registered Inflation Provision Notes provide for 6% per annum interest to be paid quarterly on a sum of money referred to as the "pre-payment value". Upon maturity, or call by plaintiff, the plaintiff is to pay the "maturity value" or the "pre-payment value" as the case may be, which is to be at least 100% of the face value. The maturity or pre-payment value must be determined according to the Consumers' Price Index, published monthly by the Bureau of Labor Statistics. An annual determination is made as of August 15.

Plaintiff would have borrowed these funds from a general commercial lender under the same terms as are contained in the inflation provision notes if it could not have secured the funds from its shareholders and employees.

17. The Registered Inflation Provision Notes were issued under a permit granted by the Corporation Commissioner of the State of California, which authorized plaintiff to issue to its then noteholders "its inflation provision notes * * * in an aggregate face amount of not to exceed $557,700.00 as consideration for the cancellation of applicant's indebtedness to them in the sum of $557,700.00".

18. The Registered Inflation Provision Notes were recorded in the liability section of plaintiff's general ledger, as well as in its subsidiary records.

19. Plaintiff, on or about January 8, 1954, purchased for $72,606.87 a parcel of land in the City of Industry, California, for the purpose of erecting a modern plant. On or about November 25, 1955, plaintiff secured a loan of $250,000.00 from The Great-West Life Assurance Company, Winnipeg, Canada, which was secured by a deed of trust on said property in the City of Industry. Plaintiff has met all of its payments to The Great-West Life Assurance Company as they became due.

Under the terms of the loan agreement with The Great-West Life Assurance Company plaintiff cannot, without the prior consent of the company, (a) redeem the Registered Inflation Provision Notes prior to maturity, and then only if there is no default under the terms of the deed of trust securing the loan, or (b) pay any dividends if earned surplus is less than the balance of earned surplus at September 30, 1954, or if such payment would reduce earned surplus to less than the balance of earned surplus at September 30, 1954. Plaintiff is permitted to pay interest on the inflation provision notes, except when it is in default in payments required to be made to The Great-West Life Assurance Company.

20. Plaintiff's sales for the fiscal year 1940 were $1,436,000.00; for 1953, $7,223,000.00; and for 1958, $7,550,000.00. During the taxable years its sales ranged from $6,000,000.00 to $9,000,000.00.

Plaintiff's net worth in 1940 was $333,959.00; in 1953, $1,250,000.00; and in 1960, $2,200,000.00.

21. In addition to the Registered Inflation Provision Notes issued in 1954, plaintiff had outstanding short-term notes issued to stockholders and close relatives of stockholders. Part were 4½% eighteen-month notes; the balance were 6% three-year notes. These notes were issued on a temporary, or interim, basis with the intention that they be renewed from time to time until eventually converted to long-term Registered Inflation Provision Notes. The notes totaled $101,500.00 as of September 30, 1954, and $189,800.00 as of September 30, 1958.

22. As of September 30, 1954, the capital stock and Registered Inflation Provision Notes were owned by the stockholders and the non-stockholder-employees in the following percentage amounts:

| Bennett Group | % Stock | | % Notes | |
|---|---|---|---|---|
| H. C. Bennett | 14.6965 | | 12.6053 | |
| Frank K. Bennett | 5.9638 | | 9.1626 | |
| John C. Bennett | 5.9638 | | 11.9957 | |
| Walter Bennett | 5.9638 | 32.5879 | 14.2908 | 48.0544 |
| E. W. Bennett | 19.1693 | | 9.0550 | |
| Mary K. Burrud | 4.7924 | | 4.8413 | |
| Margaret E. Kruse | 5.1118 | 29.0735 | 5.3792 | 19.2755 |
| Utility Holding Corp., Ltd. | | 13.0991 | | ∅ |
| Total Bennett Group | | 74.7605 | | 67.3299 |
| Knox Group | | | | |
| G. L. Knox | 17.8381 | | 15.0798 | |
| Walter G. Knox | 1.3312 | | 3.0482 | |
| Total Knox Group | | 19.1693 | | 18.1280 |
| Other Employees | | | | |
| P. M. Heinmiller | 4.4728 | | 7.6564 | |
| G. W. Auer | ∅ | | 3.2275 | |
| Michael Saunders | ∅ | | 1.3808 | |
| Virgil Waters | 1.5974 | | .3945 | |
| K. O. Dohman | ∅ | | .4484 | |
| A. J. Molinar | ∅ | | .8966 | |
| L. R. Jones | ∅ | | .1793 | |
| Wm. Mitchell | ∅ | | .3586 | |
| Total Other Employees | | 6.0702 | | 14.5421 |
| Total | | 100.0000 | | 100.0000 |

---

23. With a few minor changes during some of the years, the following persons were the officers and directors during the taxable years:

| | |
|---|---|
| J. C. Bennett | President |
| G. L. Knox | Vice President |
| E. W. Bennett | Vice President |
| W. Bennett | Treasurer |
| E. C. Hummel | Vice President |
| P. M. Heinmiller | Vice President |
| V. D. Waters | Assistant Secretary-Treasurer |
| Carl Auer | Vice President |

Directors: H. C. Bennett
J. C. Bennett
G. L. Knox
E. W. Bennett
E. C. Hummel
P. M. Heinmiller
W. Bennett

24. During the years 1954 to 1958, inclusive, the ratios of plaintiff's long term notes to net worth were as follows:

| Years | Percentage |
| --- | --- |
| 1954 | 66 |
| 1955 | 78 |
| 1956 | 69 |
| 1957 | 68 |
| 1958 | 64 |

During each of the ten years preceding the year 1954, the debt to worth ratio was as follows:

| | |
| --- | --- |
| 1944 | 71 |
| 1945 | 82 |
| 1946 | 87 |
| 1947 | 92 |
| 1948 | 78 |
| 1949 | 75 |
| 1950 | 63 |
| 1951 | 57 |
| 1952 | 58 |
| 1953 | 43 |

25. As of April 1, 1954, if plaintiff had been required to pay off the then outstanding notes to stockholders instead of issuing the Registered Inflation Provision Notes, "it would have been forced to stay where it was and curtail its operations". The same situation would have prevailed in prior years had plaintiff been required to pay off the notes on their due dates instead of issuing renewal notes.

26. Plaintiff has never repaid any of the long-term notes issued to its stockholders. It has not prepaid any of the Registered Inflation Provision Notes of any employee-noteholders who have left the employ of plaintiff.

27. In 1955 plaintiff's profit sharing trust charged from 4% to 6% simple interest on trailer paper in which it invested. These were loans ranging from one and one-half to five years. In 1954 California Bank charged plaintiff 4½% on its 90-day unsecured notes. This was a point and a half over prime. The prevailing rate for unsecured term loans in Los Angeles, California, during 1954 for a company the size of plaintiff ranged between 5½% and 6%.

28. In making a credit analysis of plaintiff in 1954, California Bank treated plaintiff's obligations to its stockholders as part of plaintiff's net worth in computing its worth to debt ratio. The bank did not treat any of plaintiff's other obligations as part of net worth. The "worth to debt" ratio is the ratio between the company's net worth and its liabilities.

29. In a credit discussion with a senior vice president of California Bank on or about September 28, 1954, Mr. Knox stated that the plaintiff's then current position was such as to fully protect short-term creditors. He stated also his awareness that any long-term obligations would require subordination of the Registered Inflation Provision Notes to such long-term indebtedness. The bank did not require plaintiff to subordinate the Registered Inflation Provision Notes to its short-term notes to the bank; but required plaintiff to state by letter that the notes would not be prepaid without prior advice to the bank.

30. The Registered Inflation Provision Notes contain no subordination agreement. They are not subordinate to the claims of other general creditors of plaintiff, and, on dissolution or bankruptcy, the noteholders would rank equally with other unsecured creditors.

31. At a meeting on January 9, 1957, between two of plaintiff's officers and several officers of California Bank, one of the bank officers asked Mr. Knox if plaintiff had ever given thought to converting the Registered Inflation Provision Notes into stock. Mr. Knox replied that plaintiff had obtained a "ruling" that if such a change took place the notes would become a part of capital structure and dividends would have to be paid. He said this would create an additional tax burden and would not at all be feasible.

32. Plaintiff deducted on its return as interest for each of the taxable years the amount paid the noteholders, which was computed at 6% of the pre-payment value based on the Consumers' Price Index.

In addition, plaintiff claimed a deduction for "discount expense". This was calculated by multiplying the face values of the notes by the increase in the Consumers' Price Index since issuance of the notes, and comparing such amounts with the face values. The original discount placed on the books as of April 1, 1954, was $189,213.00. Annual discount expense was composed of two items: (1) a pro-rata amortization of the original discount of $189,213.00; and (2) an item representing the annual fluctuation in the Cost-of-Living Index which either reduces or increases the discount expense, depending on which way the cost of living goes. In each of the taxable years, except 1955, item (2) represented an increase in the discount expense. Plaintiff did not set up a sinking fund for either the Registered Inflation Provision Notes or any of the predecessor notes.

33. The following table shows respectively the amounts paid by plaintiff on account of its Registered Inflation Provision Notes, the amounts paid to noteholders who owned no stock and allowed by the Commissioner, and the balances paid to noteholders who owned stock and not allowed:

| Fiscal Year Ended 9/30 | Paid by Plaintiff | Allowed | Not Allowed |
|---|---|---|---|
| 1954 | $22,407.32 | $1,868.06 | $20,539.26 |
| 1955 | 44,814.64 | 1,868.06 | 42,946.58 |
| 1956 | 44,627.76 | 3,217.76 | 41,410.00 |
| 1957 | 45,516.23 | 2,300.09 | 43,216.14 |
| 1958 | 47,152.08 | 2,416.00 | 44,736.08 |

34. The so-called pre-payment value of the outstanding Registered Inflation Provision Notes with a face value of $557,700.00 at the end of each fiscal year was as follows:

| Fiscal Year Ended 9/30 | Pre-payment Value | Excess Pre-payment Value Over Face |
|---|---|---|
| 1954 | $746,913.00 | $189,213.00 |
| 1955 | 743,795.00 | 186,095.00 |
| 1956 | 758,595.00 | 200,895.00 |
| 1957 | 785,868.00 | 228,168.00 |
| 1958 | 803,410.00 | 245.710.00 |

35. In placing the inflationary write-up of $189,213.00 on its books on or about April 1, 1954, plaintiff's bookkeeper prepared a journal voucher containing a charge to "Earned Surplus" of $189,213.00 and a credit to Registered Inflation Provision Notes in the same amount. After September 30, 1954, plaintiff's auditor made certain journal entries which, in effect, credited earned surplus in the amount of $189,213.00 and charged a new account, "Discount on Notes Payable" in the same amount.

36. Plaintiff accrued on its books of account and deducted on its income tax

returns as discount expense the following amounts for the years indicated:

| Fiscal Year Ended 9/30 | Amount Amortized |
|---|---|
| 1954 | $ 6,648.97 |
| 1955 | 10,180.07 |
| 1956 | 28,098.03 |
| 1957 | 40,570.80 |
| 1958 | 30,839.34 |

37. The following table shows for each of the years involved (1) face value of the notes, (2) interest paid and the per cent to face value, (3) discount amortized and the per cent to face value, (4) annual adjustments and per cent to face value, and (5) the total cost of borrowing and the per cent to face value:

| | Per cent of Interest and Discount to Face Value of Notes | | | | |
|---|---|---|---|---|---|
| | Six Months 1954 | 1955 | 1956 | 1957 | 1958 |
| Face Value of Notes | 557,700.00 | 557,700.00 | 557,700.00 | 557,700.00 | 557,700.00 |
| Interest Paid | 22,407.32 | 44,814.64 | 44,627.76 | 45,516.23 | 47,152.08 |
| Per cent to Face Value | 8.02 | 8.03 | 8.00 | 8.16 | 8.45 |
| Discount Amortized | 6,648.97 | 13,297.95 | 13,297.95 | 13,297.92 | 13,297.98 |
| Per cent to Face Value | 2.4 | 2.38 | 2.38 | 2.38 | 2.38 |
| Annual Adjustment | None | (3,117.88) | 14,800.08 | 27,272.85 | 17,541.39 |
| Per cent to Face Value | | (.56) | 2.65 | 4.89 | 3.14 |
| Total Cost of Borrowings | 29,056.29 | 54,994.71 | 72,725.79 | 86,087.00 | 77,991.45 |
| Per cent to Face Value | 10.42 | 9.86 | 13.04 | 15.44 | 13.98 |

The court's findings of ultimate facts and conclusions of law are incorporated in the memorandum opinion which follows.

The questions presented are (1) whether the payments made by plaintiff to those holders of the registered inflation provision notes who were also stockholders, in

the amounts set forth in finding 33, constitute interest and are therefore allowable as deductions within the purview of Section 23(b) of the Internal Revenue Code of 1939 [2] and its successor, Section 163(a) of the Internal Revenue Code of 1954; [3] and (2) whether the amortized portions of the discount claimed in plaintiff's return, in the amounts set forth in finding 36, constitute allowable deductions in the determination of plaintiff's net taxable income, within the purview of the same sections. Defendant contends that the alleged interest payments were in reality the distribution of property with respect to corporate stock under Section 301(a) of the Internal Revenue Code of 1954. [4]

 We are concerned initially with whether the registered inflation provision notes constitute an indebtedness, as plaintiff contends, or shares of capital stock, as defendant contends. The essential difference between a creditor and a stockholder is that "the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event". Wilshire & West. Sandwiches v. C. I. R., 9 Cir. 1949, 175 F.2d 718, 721, quoting

from C. I. R. v. Meridian & Thirteenth Realty Co., 7 Cir. 1942, 132 F.2d 182, 186. [5] The issue presented is a "mixed question of law and fact" in the application of the statutes to the particular set of . facts. See concurring opinion of Judge Waterman, Gilbert v. C. I. R., 2 Cir. 1957, 248 F.2d 399, 408. It is clear also that the "incidence of taxation depends upon the substance of a transaction" and that the transaction must be viewed as a whole. C. I. R. v. Court Holding Co., 1945, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981. The burden of proving that the payments were interest rests with the taxpayer, and the entire history of the corporation's operations must be considered. Wilbur Security Company v. C. I. R., 9 Cir. 1960, 279 F.2d 657, 661.

 Many factors have been considered by the courts in determining whether a transaction constitutes an indebtedness or contribution to capital. No one characteristic "can be said to be decisive in the determination of whether the obligations are risk investments * * * or debts". John Kelley Co. v. Commissioner, 1946, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278. [6] Nor is it suf-

---

2. Section 23(b) of the Internal Revenue Code of 1939 reads:
 "§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:
 * * * * *
 "(b) Interest. All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter."

3. Section 163(a) of the Internal Revenue Code of 1954 reads:
 "§ 163. Interest
 "(a) General rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

4. Section 301(a) reads in pertinent part:
 "§ 301. Distributions of property

"(a) In general.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c)."

5. See also Gilbert v. C. I. R., 2 Cir. 1957, 248 F.2d 399, 402, where the court said: "The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes * * *, too great a variation will of course preclude such treatment."

6. Apparently this is the only opinion in which the Supreme Court has considered the distinction between dividends and interest for tax purposes. The Court there

ficient to check-list each factor for its presence or absence. Rather, all of the factors must be weighed and considered together. Universal Castings Corp., 37 T.C. 107, aff'd 7 Cir. 1962, 303 F.2d 620. While there is general agreement with respect to the factors to be considered, the correct application of these factors to the particular transaction often presents a difficult problem. Gooding Amusement Co. v. C. I. R., 6 Cir. 1956, 236 F.2d 159, 165.

In O. H. Kruse Grain & Milling v. C. I. R., 9 Cir. 1960, 279 F.2d 123, 125, the court held that there are "at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness". These factors are: "(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions."[7] The most important single factor is intent,[8] which must be determined in the light of all the relevant facts and surrounding circumstances, including the more objective factors enumerated above.

Plaintiff contends that it has met each of these tests. Defendant refers to tests 1, 2, 3, 7 and 10 as "bootstrap factors", which should be accorded little weight; and argues that the eleven tests are by no means exclusive, but that variations of these tests and additional criteria have been considered in other cases, and that the "economic realities" of the transaction as a whole establish an investment in equity capital rather than a debt.

In support of its contention that the "economic realities" show a contribution to equity capital, defendant relies upon the following: (1) the "borrowing" from stockholders, beginning around 1940, was for basic capital needs and became a "permanent investment in the risk of the business"; (2) the principal noteholders were not only stockholders, but also officers and directors of plaintiff and, in effect, "participated fully in management, albeit by wearing the hat of a stockholder"; (3) plaintiff has never repaid any of the long-term notes issued to its stockholders, and the registered inflation provision notes were an extension, under a new label, of notes issued many years

reviewed two cases (C. I. R. v. John Kelley Co., 7 Cir. 1944, 146 F.2d 466, and Talbot Mills v. C. I. R., 1 Cir. 1944, 146 F.2d 809), which turned upon the question of whether payments made under certain corporate obligations were interest or dividends. As the Court said, the obligations "had only one striking difference, the noncumulative in one (Kelley) and the cumulative quality in the other (Talbot Mills) of the payments reserved under the characterization of interest". In affirming Talbot Mills and reversing Kelley, the Court said in part: "The documents under consideration embody elements of obligations and elements of stock. There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. So-called stock certificates may be authorized by corporations which are really debts, and promises to pay may be executed which have incidents of stock." (326 U.S. at 530, 66 S.Ct. at 304) Three separate dissents did not recognize the distinction between the two cases. For a discussion of the Kelley Company and Talbot Mills cases, see 4 Mertens Law of Federal Income Taxation, § 26.10 and 26.10b.

7. See also Wilbur Security Company v. C. I. R., supra; 4 Mertens Law of Federal Income Taxation, § 26.10c.

8. See Wilshire & West. Sandwiches v. C. I. R., supra; and C. I. R. v. Proctor Shop, 9 Cir. 1936, 82 F.2d 792, where payments in the form of dividends on debenture preference stock were found, according to the intent of the parties, to be interest.

before; (4) with respect to plaintiff's intent, the statement of its vice president that it was understood that the notes would be ultimately "converted into stock as soon as the tax laws are favorable to such action", and that he would not enforce payment of the notes if such enforcement would hurt plaintiff; (5) if plaintiff had been required to pay off the outstanding notes in 1954 instead of issuing the inflation provision notes, it "would have been forced to stay where it was and curtail its operations"; (6) the fact that year in and year out the payments to stockholders as "dividends" were quite nominal; and (7) an alleged tacit understanding among the controlling stockholders to keep their noteholdings proportional.[9]

The instruments in question were designated promissory notes and have a fixed maturity date. While the name given to an instrument is not controlling, the designation by the corporation may not be completely ignored. Washmont Corporation v. Hendricksen, 9 Cir. 1943, 137 F.2d 306. One of the important characteristics of a debt is a "definite determinable date on which the principal falls due". Washmont Corporation v. Hendricksen, supra; C. I. R. v. H. P. Hood & Sons, 1 Cir. 1944, 141 F.2d 467, 470. The notes here meet this test.

It is true, however, as defendant contends, that the notes in question constitute renewals of prior notes, some of which were issued as early as 1940, and that no payment has ever been made on the principal of any of the notes. Interest has been paid regularly when due. In general, the corporation borrowed from banks on short-term notes for operating expenses and from its stockholders and employees on long-term notes for plant expansion, although when the registered inflation notes were issued, there were also outstanding short-term notes to stockholders and close relatives of stockholders in excess of $100,000. The corporation has grown steadily and rapidly from the time of its organization, with a particularly rapid growth during the World War II years. There has been a constant need for additional funds for the expanding business, including the acquisition of new plant facilities. While the funds represented by the notes could be used for any purpose, it is obvious that most of the advances were in fact invested in permanent assets. On the other hand, the notes were not issued for capital assets transferred to the corporation upon the incorporation of the business, as in Brake & Electric Sales Corporation v. United States, supra, (Note 9) and O. H. Kruse Grain & Milling v. C. I. R., supra. They were not issued for property which had theretofore been subject to the risks of the business, or even for the acquisition of any specific property; nor did they represent a conversion of stock to notes.

9. Defendant relies strongly on Brake & Electric Sales Corporation v. United States, D.Mass.1960, 185 F.Supp. 1, aff'd 1 Cir. 1961, 287 F.2d 426. In that case the owner of a business formed a corporation to take over the business, becoming the sole stockholder and having sole control of the new corporation. He advanced $20,000 in cash for common stock. He transferred to the corporation substantially all of the assets shown on the books of the individual proprietorship (except for cash and real estate) and on March 1, 1950, took a note for $90,000, representing the net equity of the proprietorship as shown by its books of account. The assets transferred were essential to the conduct of the business and during the sole proprietorship had been subject to the risks of the business. In 1952 the $90,000 note was replaced by two notes for $6,000 each and one note for $78,000. The two smaller notes were endorsed to the owner's minor children. On March 1, 1955, the notes were extended for five years and on March 1, 1960, for one year. Interest was paid regularly. No dividends were ever paid. The court held that the notes represented an equity investment in the corporation, subject to the risks of the business. In affirming, the court of appeals agreed that the fact "that the notes were extended when due in spite of the great prosperity of the corporation is evidence that it was not intended in 1950 that the alleged obligation be enforced when it became due". (287 F.2d at 428)

■ The failure to pay the various notes at maturity was due to the continuous growth of the business and increasing need for funds both for operation and plant expansion. I do not believe it can be inferred therefrom that the parties did not intend, when the notes were issued, that they would not be paid when due, as the court concluded under totally different facts in Brake & Electric Sales Corporation v. United States, supra. The failure of the stockholders and employees to demand payment upon maturity of the prior notes does not in itself evidence an intent to treat the obligations as equity capital. "The same strict insistence on payment on due date as would be the case if a bank were the creditor, should not be expected." Wilshire & West. Sandwiches v. C. I. R., supra.[10]

■ Where purported loans are made in proportion to stockholdings, the transaction is subject to close scrutiny, but this circumstance alone is not conclusive that the advances are capital contributions. Earle v. W. J. Jones & Son, 9 Cir. 1952, 200 F.2d 846, 850.[11] While there is a rather close parallel in stock and note ownership,[12] particularly if members of the Bennett and Knox families are considered as groups, the stock ownership is not in direct proportion to the loans with respect to any of the eleven stockholders, and 6½% of the notes are held by nonstockholders.[13] Moreover, the so-called capital contributions and loans were not unidentified portions of a single, "locked-in" investment or even made at the same time.[14] In fact, the first stock was issued more than 20 years before the initial borrowing from stockholders and employees.[15]

10. See also Rowan v. United States, 5 Cir. 1955, 219 F.2d 51, 55, where the court said: "But the court also recognizes that, entirely without reference to the incidence of taxes stockholders of corporations have always been free to commit to corporate operations such capital as they choose and to lend such additional amounts as they may elect to assist in the operation if that is their true intent, always thus reserving the right to share with other creditors a distribution of assets if the enterprise fails."

11. See also Wilshire & West. Sandwiches v. C. I. R., supra, where the incorporators advanced $30,000, "half of which was to be capital stock contribution and half a loan". The Commissioner and Tax Court relied strongly upon this understanding in holding that the interest on the notes was not deductible. In reversing, the court said in part: "The individuals desired to be in a position to participate with general creditors for part of their investment in the event petitioner's business was not successful. In addition, they regarded a loan to be a better investment than stock to obtain returns on and repayment of their capital outlay. They decided against borrowing from a bank because they considered the receipt of interest desirable." (175 F.2d at 719)

12. This is not, however, a case such as O. H. Kruse Grain & Milling v. C. I. R., supra, where there was a "100% identity of interest between noteholder and stock-

hold, who with his wife, owned 100% of the stock". (279 F.2d at 126)

13. As of September 30, 1954, members of the Bennett family owned 74.7605% of the stock (including 13.0991% issued to Universal Holding Corp., Ltd., a corporation owned by members of the Bennett family) and 67.3299% of the notes. Members of the Knox family owned 19.1693% of the stock and 18.1280% of the notes. Two other employees owned 6.0702% of the stock and 8.0509% of the notes. Six non-stockholder employees owned 6.4912% of the notes.

14. Cf. Universal Castings Corporation v. C. I. R., 7 Cir. 1962, 303 F.2d 620, 626, where the shareholders and note creditors were not only identical, but by written agreement, "the notes could not be separated from the stock". As the court said, "Because of this lock-in feature, the Tax Court correctly found that it would be impossible at any time for the interests of the noteholders' group to differ from those of the shareholders." See also Earle v. W. J. Jones & Sons, supra. (200 F.2d at 850)

15. Cf. Laidley, Inc. v. Commissioner, 1961, 20 T.C.M. 917, cited by defendant. There it was held that an unsecured promissory note "issued by petitioner on the day of its formation and before it had issued any capital stock to two individuals, who thereafter became its sole stockholders, in exchange for petitioner's principal asset did not, in reality, represent an in-

Defendant contends that the "noteholders' status was something less than that of regular corporate creditors" and that "there was some degree of subordination with respect to the insurance company loan". The notes themselves contain no subordination clause. Under the terms of the insurance company loan agreement plaintiff cannot, without the prior consent of the company, redeem any notes prior to maturity, and then only if there is no default under the terms of the deed of trust securing the loan. Plaintiff is permitted, however, to pay interest on the notes, except when it is in default in payments required to be made to the insurance company. The notes are not subject to the claims of other general creditors. On dissolution or bankruptcy, the notes would rank equally with other unsecured creditors to the exclusion of stockholders.

In any event, "Subordination to general creditors is not necessarily indicative of a stock interest. Debt is still debt despite subordination." Kraft Foods Company v. C. I. R., 2 Cir. 1956, 232 F.2d 118, 125.[16] The limited subordination here is of little significance in determining the relationship of the parties and is not indicative of a stock interest.

It is true, as defendant contends, that Gooding Amusement Co. v. C. I. R., supra, is in some respects similar to the instant case. There, a divided court concluded that the findings of the Tax Court were not clearly erroneous and that the Tax Court had appropriately concluded that the instruments did not constitute interest on an indebtedness. There are, however, distinguishing features between Gooding and this case. Stock and notes

had been issued in exchange for assets transferred to a newly formed corporation by a partnership, and as the court said: "The portion of the assets contributed for the shares and that contributed for notes was not identified." The opinion quoted what it termed a controversial and crucial finding of the Tax Court as follows: " 'The principal amount of the other notes issued August 24, 1946, was not paid because the corporation was heavily indebted to outsiders and at no time during the period involved had a sufficient cash balance. Petitioner, who as president and majority stockholder controlled the corporation, subordinated the claims of himself and his family to those of banks and other third parties. Petitioner felt that such subordination was necessary in order to maintain the corporation's credit standing. Petitioner and his family at no time had any intention of enforcing their matured claims against the corporation.' " (236 F.2d at 162)

The failure to enforce payment of the principal when due is a factor from which courts in other cases have drawn an inference that the noteholders did not at the time of issuance of the notes, or at any time, intend to enforce their matured claims against the corporation. As noted supra, however, the plaintiff here has offered a satisfactory explanation of the failure to pay the notes when due and in increasing its borrowing from time to time as the business grew and prospered. True, if the notes had been paid when due, it would have been necessary to curtail plaintiff's operations. But that is quite different from an inability to pay the notes because of being heavily indebt-

---

debtedness but rather an equity capital investment". The court also referred to the fact that at the time of incorporation "not one cent had been paid in for its capital stock; and thus petitioner's debt to equity ratio, then and for approximately one year thereafter, was, in round numbers 80,000 to one".

16. In John Kelley Co. v. C. I. R., supra, the court of appeals, in holding that the debentures "obviously evidenced risk capi-

tal, not creditor capital", had based its conclusion in part on the fact that the debentures "were to be paid only after all other creditors were paid; and the 'interest' on the debentures was to be paid only if sufficient net income was earned within the period". (146 F.2d at 468) As noted supra, the Supreme Court reversed, holding that the conclusion of the Tax Court that the annual payments were interest on indebtedness should be accepted.

ed to outsiders and by reason thereof concluding that subordination to the debts owed outsiders was necessary to maintain the corporation's credit standing. The failure to pay the prior notes when due, with the successive renewals, does not, under the circumstances here, justify an inference that the noteholders did not intend to enforce their obligations at maturity.

A "thin capitalization" has been held in some cases to indicate the lack of a bona fide debtor-creditor relationship.[17] It was held in Miller's Estate v. C. I. R., 9 Cir. 1956, 239 F.2d 729, 733, however, that in determining debt-equity ratios, real values rather than artificial par and book values, should be applied, and that if "the capital stock was worth $100,000, or thereabouts, as has been indicated, an indebtedness of $174,000 would not be disproportionate, and no such ratio has ever been held to create a fatally thin capitalization". The debt-equity ratio here was always less than one to one. The issuance of the inflation provision notes did not result in an increase in the debt-equity ratio; nor was there any increase during the taxable years in question. The "thin capitalization" factor therefore is not present. Moreover, as Judge Waterman said in his concurring opinion in Gilbert v. C. I. R., supra, "Once it is established that the parties' equity investment is more than nominal, the means by which the corporation's activities are financed is a mat-

ter to be handled in whatever way seems most advantageous to it." (248 F.2d at 410)

Defendant does not contend, however, that plaintiff had a "thin capitalization", but argues that as a matter of "substance" and "economic realities" [18] the advances constituted a "permanent investment in the risk of the business". In support of this contention, defendant argues that of the approximate total of $2,600,000, representing plaintiff's "permanent capital", only $52,000 represented capital issued for cash. It is true that during its entire history (some 44 years) plaintiff has "plowed back" practically all of its earnings, and that in 1949 and 1954 it issued non-taxable stock dividends totalling $746,000. This is not, however, an unusual practice in a rapidly growing and successful business. It cannot be said to support a conclusion that a "wholly inadequate part" of plaintiff's financial structure is attributable to stock.

In support of its contention that an investment in capital was intended, defendant argues that in 1946 Mr. Knox, plaintiff's executive vice president, stated to one of the officials of the California Bank that "under no circumstances would the long-term notes due stockholders (then totalling $187,000) be paid in cash and 'that it was definitely understood that they will ultimately be converted into stock as soon as the tax laws are favorable to such action' ".[19] The lan-

---

17. In Root v. C. I. R., 9 Cir. 1955, 220 F. 2d 240, 241, the court quoted with approval from Schnitzer v. Commissioner, 13 T.C. 43, 62—a decision affirmed by the 9th Circuit in 183 F.2d 70, as follows: "A corporation's financial structure in which a wholly inadequate part of the investment is attributed to stock while the bulk is represented by bonds or other evidence of indebtedness to stockholders is lacking in the substance necessary for recognition for tax purposes, and must be interpreted in accordance with realities."

18. As Judge Learned Hand said in his dissenting opinion in Gilbert v. C. I. R., supra (248 F.2d at 412), it is not always clear just what is meant by "economic

realities". He suggests that to say that a transaction has "substantial economic reality" or is a "sham" or a "masquerade" leaves the test undefined, "because they do not state the facts that are to be determinative".

19. In January, 1957 one of the officers of the bank asked Mr. Knox whether plaintiff had considered converting the registered inflation provision notes into stock. Mr. Knox replied that plaintiff had obtained a "ruling" that if this were done the notes would become a part of the capital stock and dividends would have to be paid; that this would create an additional tax burden and would not be feasible. The fact that the noteholders considered the tax consequences in deter-

guage quoted must be considered in the context of Mr. Knox's entire testimony on this point, which does not completely support counsel's contention. The bank official (Mr. Hansen) was not called as a witness.[20] Moreover, the notes outstanding in 1946 were convertible into stock at the option of plaintiff. Mr. Knox's statement is readily understandable in view of the conversion feature of the notes then under discussion.

Renewal notes subsequently issued were not convertible at the option of plaintiff, but rather at the option of the noteholders. The inflation provision notes in question contained no option for conversion. Defendant contends, however, that the notes in the 1940's containing an option in the plaintiff were in fact stock and that the present notes are likewise stock. Although the original notes issued in the 1940's and the renewal notes of 1949 and 1952 were not questioned, the entire history of the note transactions may properly be considered. While the conversion feature of the original notes lends some support to defendant's position, it is significant that the conversion feature upon which defendant relies was eliminated in the renewal notes long before there was any contention that the notes represented equity capital. Under these circumstances the conversion feature is by no means controlling and does not establish an intent to create a stockholder rather than debtor-creditor relationship.

It is significant also that defendant does not question the deduction of interest paid to noteholders who were not stockholders. Can it be said that the same instruments are stock in the hands of some holders and debts in the hands of others? This question was answered in the negative in Gloucester Ice & Cold Storage Co. v. C. I. R., 1 Cir. 1962, 298 F.2d 183, 185,[21] where the court said:

> "There can be no doubt that the debentures are evidences of indebtedness in the hands of the non-stockholders who purchased $15,500 worth of them and they are equally so in

mining whether the notes should be converted into stock does not manifest an intent to create equity capital rather than debt, nor can it be said that the transaction was lacking in a "business purpose" and that the sole purpose of issuing notes was to minimize taxes. See Kraft Foods Company v. C. I. R., supra; Miller's Estate v. C. I. R., supra.

20. This testimony reads in pertinent part:
"Q. Did you ever talk to Mr. Hansen about the optional notes in February, 1946?
"A. I have no recollection as to the date. We talked a number of times with Mr. Hansen regarding the general financial situation of the company, because he was the highest official in the bank that we had any dealings with.
"Q. Did you at about that time state in substance to Mr. Hansen that under no circumstances would optional notes due stockholders amounting to $187,000 be paid in cash, and that it was definitely understood that they will ultimately be converted into stock as soon as the tax laws are favorable to such action?
"A. It is quite probable at that time I would make such a statement.
"Q. Did you use those words?
"A. I have no recollection what words I used, no.
"Q. Have you any doubt about it?

"A. No, I think that is quite probable. May I ask, referring to something there you have, was that in connection with a loan application or just a general credit application?
"Q. Suppose you tell the Court what the circumstances were?
"A. I have no idea. We talked to Mr. Hansen a good many different times, keeping him fully informed as to the financial problems of the company, and I recall that around that time we had an open line of credit of about $300,000 and I wouldn't be surprised if we were using it."

21. In Gloucester Ice & Cold Storage Co. v. C. I. R., the court reversed a decision of the Tax Court which had held that debenture holders "had placed their money at the risk of the business, and therefore in effect were stockholders so that the payments to them were dividends because (1) the bonds were held in approximate proportion to the shares of stock, (2) the proceeds of the debenture issue were used to purchase a fixed asset, i. e., a majority of the stock of Cape Pond Ice Company, (3) the bonds were issued simultaneously with the call of the preferred stock for redemption and (4) the debt-to-equity ratio was disproportionately high, being 15 to 1." (298 F.2d at 185) Of $100,000 in bonds issued, nonstockholders had purchased $15,500.

the hands of those who also owned stock in the petitioner, for their classification depends upon an analysis of their provisions, not upon who owns them. No intrinsic tax consequences flow from a stockholder's loan of money to his corporation. See Rowan v. United States, 219 F. 2d 51, 55 (C.A.5, 1955)."

Weighing all of the factors together, it is my conclusion that the parties intended and created a genuine debtor-creditor relationship. The facts supporting this conclusion appear stronger for the taxpayer than in many cases where the Tax Court or appellate court found this relationship, including Wilshire & West. Sandwiches v. C. I. R., supra, and John Kelley Co. v. Commissioner, supra.[22]

If there is a genuine debtor-creditor relationship, as I have found, it is immaterial that the interest is payable at a fixed rate of 6% on a fluctuating maturity or prepayment value. Defendant apparently does not contend otherwise. Interest to be deducted need not be computed at a rigid stated rate. In Kena, Inc. v. Commissioner, 1941, 44 B.T.A. 217, 221, the rule is recognized that: "It is not essential that interest be computed at a stated rate, but only that a sum *definitely ascertainable* shall be paid for the use of borrowed money, pursuant to the agreement of the lender and borrower. Except for the usury laws of the several states, there is no limit set upon the amount of interest which may be paid under specific contract between the creditor and the debtor." (Emphasis added)

In Dorzback v. Collison, 3 Cir. 1952, 195 F.2d 69, the court quoted with approval from Kena, Inc. v. Commissioner, and continued:

" * * * There is no requirement in Section 23(b) that deductible interest be ordinary and necessary or even that it be reasonable. 4 Mertens, Law of Federal Income Taxation, § 26.01. Hence the phrase 'All interest paid' contained in that section must be taken in its plain and literal meaning to include whatever sums the taxpayer has actually had to pay for the use of money which he has borrowed. * * * " (195 F.2d at 72, 73)

Interest in the amounts specified in finding 33 was properly deducted, and plaintiff is entitled to a refund of the deficiencies resulting from the non-allowance of this interest.

We turn now to the question of whether plaintiff was entitled to deduct as discount expense the amounts set forth in finding 36. The registered inflation provision notes provide that upon maturity, or earlier call, plaintiff will pay an amount equal to "maturity value" or "prepayment value",[23] as the case may be. This value shall be at least 100% of the face amount of the notes and be determined under a formula using the Consumer's Price Index for August 15 of the year of maturity, or of the year preceding earlier call.

Each year plaintiff has computed the prepayment value in accordance with the terms of the notes. Plaintiff contends that the difference between the "face amount" and the "prepayment value" of the notes constitutes discount and should be spread over the life of the notes.[24] Defendant contends that there is no precedent in the statutes, regula-

22. See discussion of facts in the court of appeals opinion (146 F.2d 466), which was reversed by the Supreme Court.

23. The maturity and prepayment values are amounts equivalent to the purchasing power of the face amount of the notes on the "original date", i. e., the date upon which the plaintiff's obligation to the noteholder was originally incurred. Thus the notes are designed to return to the

lender an amount equivalent in purchasing power to the money he originally invested and not merely the equivalent of the face amount of the inflation provision notes at the time of their issue.

24. In 1955 $3,117.88 was restored to income due to a decrease in the Consumer's Price Index and was reflected in plaintiff's tax return.

tions, or case authority to support plaintiff's position, and that it is pure speculation to attempt to amortize any part of the prepayment value in excess of face value as discount. I agree with defendant.

As noted supra, § 23(b) of the Internal Revenue Code of 1939, and its successor § 163(a) of the 1954 code, allow as a deduction "all interest paid or *accrued* within the taxable year on indebtedness". (Emphasis added) "(Discount) is the difference between the amount borrowed and the principal amount to be paid." Pierce Oil Corporation v. Commissioner, 1935, 32 B.T.A. 403, 420. Ordinarily a discount on an obligation is recognized as interest which may be amortized ratably over the life of the obligation and the current amortization deducted from gross income. Pierce Oil Corporation v. Commissioner, supra; Helvering v. Union Pacific R. Co., 1934, 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363; San Joaquin Light & Power Corporation v. McLaughlin, 9 Cir. 1933, 65 F.2d 677;[25] Reg. § 1.61–12. Conversely, a premium received by the obligor upon a note or bond is income and may be amortized over the life of the obligation. See Bayshore Gardens, Inc. v. C. I. R., 2 Cir. 1959, 267 F.2d 55; and Rev.Rul. 59–422.

In Pierce Oil Corporation v. Commissioner, supra, the rationale behind the recognition of discount was set forth as follows:

"The reason for recognizing discount is the anticipation of payment at maturity of the full amount of the obligation, which amount is greater than the amount originally received. Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289 [55 S.Ct. 158, 79 L.Ed. 367]. During the period of the obligation the supposition is indulged that it will be paid in full, and this supposition is what supports the amortization of the discount. Helvering v. Union Pacific R. R. Co., supra." 32 B.T.A. at 421.

Defendant contends that with respect to the "discount expense" claimed here, there is no definitely ascertainable interest which will permit yearly accrual, and that plaintiff accordingly does not come within the purview of the rules permitting discount amortization and deduction of current amortization in the taxable year. Reliance is placed upon cases refusing to allow taxpayers with accrual basis accounting to deduct contested obligations or items paid under protest pending litigation. See United States v. Consolidated Edison Co., 1961, 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356; Central Cuba Sugar Co. v. C. I. R., 2 Cir. 1952, 198 F.2d 214, cert. denied 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677;[26] Dixie Pine

25. In San Joaquin Light & Power Corporation v. McLaughlin, the court said: "It is recognized by the rules of the Treasury Department and by the systems of accounting in vogue in corporate affairs that these items of premium or discount, as the case may be, are but methods of adjusting the actual cost of money, and therefore, whether there is a discount or premium, that is, whether there is a loss or a profit in either case, it should be spread over the term of the bonds to make the books of the corporation reflect the actual annual cost of money rather than the nominal rate specified in the bond, so that during such term funds should be accumulated by the borrower in annual installments sufficient with interest to pay such discount or loss; or in case of premium,

or gain, that an apportionate amount of premium should be set aside each year to decrease the nominal interest for that year to the actual cost of the money for that year." (65 F.2d at 679)

26. In Central Cuba Sugar Co. v. C. I. R. the taxpayer owed a large debt at 5% and 3% interest. A Cuban moratorium on debts reduced the interest to 1%. The benefits could be waived, however, and after a few years of paying and deducting the 1% amount, the taxpayer waived the benefit of the moratorium and reallocated principal payments as payments of interest for the years in question. The litigation arose on taxpayer's attempt to carry forward a net operating loss based upon the increased interest deduction. The court denied the taxpayer's

Products Co. v. Commissioner, 1944, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270; Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725. With the exception of the Central Cuba Sugar Co. case, those cases stand for the proposition that a taxpayer may not deduct taxes as "paid or accrued" when his liability for them is in dispute. In each of those cases either the obligation itself was in question or the amount was unsettled.[27]

 Whether plaintiff's cost of borrowing the money represented by the inflation provision notes will be increased, and by how much, through the occurrence of an excess between the face value and maturity value of the notes at maturity is entirely contingent upon the cost of living index. Thus not only the *amount* but the *fact* of the increased obligation is uncertain and contingent. It is well settled that interest "payable only on the happening of a contingency" cannot be accrued and deducted prior to the occurrence of the contingency. Mertens, Law of Federal Income Taxation, § 12.95. Accordingly, it has been held that interest may not be accrued and deducted prior to the time a taxpayer becomes obligated to pay principal and interest. American Bemberg Corporation v. United States, D.Del.1957, 150 F.Supp. 355, 360, aff'd 3 Cir., 253 F.2d 691; Guardian Investment Corporation v. Phinney, 5 Cir. 1958, 253 F.2d 326; cf.

Central Cuba Sugar Co. v. C. I. R., supra. "The taxpayer must be obligated unconditionally during the taxable years in question to pay the principal and interest in order to have an accruable expense for tax deduction purposes." Guardian Investment Corporation v. Phinney, supra, 253 F.2d at 334. In Security Flour Mills Co. v. Commissioner, supra, the Supreme Court said: "It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, * * *." (321 U.S. at 284, 64 S.Ct. at 597)

 Deductions are a matter of legislative grace, and the burden is on the taxpayer of clearly showing the right to the claimed deduction.[28] Plaintiff has not cited any statute, case, or regulation which authorizes a deduction of the peculiar nature involved here. The cases and the regulation relied upon by the plaintiff involve the amortization of discounts which are definitely ascertainable and certain in amount. See Pierce Oil Corporation v. Commissioner; Helvering v. Union Pacific R. Co.; San Joaquin Light & Power Corporation v. McLaughlin, supra; and Regulation, § 1.61–12. They do not reach the situation posed here.

 It is my conclusion that plaintiff has failed to establish its right to deduct the so-called "discount expense"; and that the fact and amount of the ob-

claim, holding that accrued interest could not be deducted in the absence of a legally binding obligation to pay it which was, of course, absent during the years in question when the moratorium was in effect.

27. For example, in United States v. Consolidated Edison Co. the taxpayer paid state taxes under protest. Taxpayer recognized its liability to the extent of 85% of the amount assessed and paid under protest, and contested only the remaining 15%. Thus only the amount of the obligation, and not the basic obligation itself was in issue. Through appropriate state litigation, the taxpayer's liability was fixed at 95% of the amount assessed. The Supreme Court held that only when taxpayer's liability was finally

determined by the state court, did the additional 10% "accrue", and the 5% returned to the taxpayer did not constitute income. The Court recognized the rule laid down in earlier cases that a tax does not accrue until the occurrence of "all the events * * * which fix the amount of the tax and determine the liability of the taxpayer to pay it". See United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347.

28. C. I. R. v. Sullivan, 1958, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 559; Delaware Realty & Inv. Co. v. C. I. R., 3 Cir. 1956, 234 F.2d 911; Kelly v. C. I. R., 7 Cir., 1956, 28 F.2d 512; A B C Brewing Corporation v. C. I. R., 9 Cir. 1955, 224 F. 2d 483, 490.

ligation sought to be accrued and deducted are uncertain and contingent and not allowable as deductions in the taxable years in question. Although it might be considered prudent accounting and in accordance with conservative business policy to set aside annually a reserve for the possible excess between the face value and maturity value of the notes when they mature, this is not controlling for tax purposes. See United Grocers, Ltd. v. United States, 9 Cir. 1962, 308 F.2d 634;[29] American Automobile Ass'n v. United States, 1961, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109; Guardian Investment Corporation v. Phinney, supra. The latter case contains an excellent statement of the rule here applicable:

"Courts and Congress have said that effect should be given to accepted accounting practices. * * * But commercial accounting and tax accounting just are not always the same. Conservative business policies may require a taxpayer to set aside annually a reserve for future conditional expenses. Proper commercial accounting practices may require accrual of certain items to meet contingent liabilities, in order that the balance sheet or statement of profit and loss will reflect the true condition of a business for credit purposes or for other reasons. To 'clearly reflect' income for tax purposes, however, a deduction may not be taken for accrued interest on an indebtedness unless the debt is definite, fixed, and existing in the taxable year for which the deduction is sought. A contingent obligation may be a liability, but it is not a debt; and accrual is improper for tax deductions when the liability is contingent. 'The prudent business

man often sets up reserves to cover contingent liabilities. But they are not allowable as (tax) deductions.' Lucas v. American Code Co., 1930, 280 U.S. 445, 452, 50 S.Ct. 202, 204, 74 L.Ed. 538." (253 F.2d at 329)

Plaintiff is not entitled to the deductions claimed for discount expense, and the Commissioner properly disallowed the items of discount expense set forth in finding 36.

Counsel will confer in computing the amount due plaintiff, and counsel for plaintiff will prepare, serve, and submit form of judgment in accordance with these findings and conclusions, pursuant to Rule 7(b) of the local rules of court.

---

29. In United Grocers, Ltd. v. United States, the court said: "However, in the subsequent case of American Automobile Assn. v. United States, 1961, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109, where it was 'admitted that for [the taxpayer's] purposes the method used is in accord with generally accepted commercial accounting principles', the Court held that this does not mean that for income tax purposes it 'reflects income as to be binding upon the Treasury'. While testimony relative to accepted accounting practice may properly be considered by the court, it is not conclusive in determining the legal tax consequences of any transaction." (308 F.2d at 641)