**UNIVERSAL CASTINGS CORPORA-**
**TION, an Illinois corporation,**
**Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent.**

**No. 13619.**

United States Court of Appeals
Seventh Circuit.

May 22, 1962.

Marshall G. Sampsell, Robert A. Helman, Chicago, Ill., Isham, Lincoln & Beale, Chicago, Ill., of counsel, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Ralph A. Muoio, Atty., Tax Division, Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY, SCHNACKENBERG and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

By its petition, Universal Castings Corporation, an Illinois corporation, asks us to review a decision of the Tax Court of the United States that there were deficiencies in its income tax payments for the taxable years 1953, 1954 and 1955.

There appears little conflict in the evidentiary facts, some of which were stipulated. The contested issue is whether the Tax Court erred in finding as not deductible for federal income tax purposes the amounts paid as interest by petitioner on its "Income Notes" during those years.

Petitioner contends that the Tax Court's determination that the income notes represent equity rather than debt was clearly erroneous and was contrary to the substantial weight of the evidence.

The following facts appear in excerpts from petitioner's brief:

Prior to July 31, 1946, and up to May 18, 1950, petitioner had issued and outstanding capital stock consisting of 1,566 shares of common stock, without par value, and 1,142 shares of class A stock, par value $66 per share. The class A stock differed from the common stock only in that it had preference in the event of liquidation.

Petitioner's stock was owned during that period of time as follows:

|  | Class A Stock | Common Stock | Total Stock |
|---|---|---|---|
| Locomotive Firebox Company | 1,142 shs. | 570 shs. | 1,712 shs. |
| Louise Carr Hodgkins Trust | | 696 " | 696 " |
| Walter S. Carr | | 300 " | 300 " |
| | 1,142 shs. | 1,566 shs. | 2,708 shs. |

Locomotive Firebox Company ("Locomotive") was a publicly-owned corporation with about 700 stockholders. Walter S. Carr was its president. He was also chairman of the board of petitioner until May 18, 1950. The beneficiary of the Trust was Carr's niece.

In the summer of 1946, petitioner had an earned surplus deficit of $340,329.64 and was losing money. The three stockholders employed Lester B. Knight, president of Lester B. Knight & Associates, Inc., a firm of management and engineering consultants ("Knight Associates"), to make a review of its business.

Knight did so and reported to Carr that if certain changes were made in the management and operations of petitioner, the business could be made profitable. Carr asked Knight to take over the management of petitioner.

On or about September 20, 1946, petitioner entered into a contract with Knight Associates and W. G. Wilkins under which Knight became consultant-manager, and Wilkins became vice-president and general manager of petitioner. Both were elected to its board of directors. Under this contract, Knight Associates received as a management fee 25%, and Wilkins received as a bonus 2½%, of petitioner's net income before federal income taxes.

On August 21, 1946, petitioner borrowed $250,000 for five years from Central National Bank (the "Bank"). The loan was evidenced by petitioner's note dated August 21, 1946 and due July 21, 1951, bearing interest at the rate of 4% per year, and was secured by a chattel mortgage which covered all of petitioner's fixed assets. The repayment of 75% of the principal amount of the loan was guaranteed by Reconstruction Finance Corporation.

On the same day, petitioner's three stockholders loaned it $150,000 in the following principal amounts:

| | |
|---|---|
| Locomotive | $102,298.50 |
| Louise Carr Hodgkins Trust | 33,333.00 |
| Carr | 14,368.50 |
| | $150,000.00 |

The loans were evidenced by petitioner's five year notes, dated August 21, 1946, which bore interest at the rate of 5% per year and which were subordinated to the Bank's loan. Each of these notes contained a confession of judgment clause.

In October and November, 1946, petitioner's three stockholders loaned it an additional $50,000 in these amounts:

| | |
|---|---|
| Locomotive | $34,099.50 |
| Louise Carr Hodgkins Trust | 11,111.00 |
| Carr | 4,789.50 |
| | $50,000.00 |

For these loans petitioner gave demand notes bearing interest at the rate of 5% per year and containing confession of judgment clauses. These loans were not subordinated to the Bank's loan.

The loans made to petitioner by its stockholders were duly recorded and carried on its books of account as "Notes Payable". The loan transactions were duly authorized by its board of directors.

The three stockholders made their loans to petitioner in proportion to their respective holdings of its stock. The loan allocations were made by assigning the $200,000 principal amount of the loans 50% to the class A stock and 50% to the common stock. The loans were then prorated among the holders of each class of stock as shown by the following table:[1]

| | Stock Owned | Percentage of Stock and of Notes | Total Notes |
|---|---|---|---|
| Locomotive | | | |
| All class A stock .. | 1,142 shs. | 50.0 % | |
| Common stock .... | 570 " | 18.199 | |
| | | 68.199 | $136,398 |
| Louise Carr | | | |
| Hodgkins Trust | | | |
| Common stock .... | 696 " | 22.222 | 44,444 |
| Carr | | | |
| Common stock .... | 300 " | 9.579 | 19,158 |
| Total common .. | 1,566 shs. | 100. % | $200,000 |
| Total stock ..... | 2,708 " | | |

Within sixty days in 1946 after Knight and Wilkins took over the management, petitioner began to show a profit, and it has shown a profit for every year since then.

In the spring of 1949, because of a general business recession, petitioner requested permission from the Bank and RFC to reduce the principal payments on the Bank's loan. The Bank and RFC granted the request on these conditions, which were accepted by petitioner and its stockholders:

(1) The three stockholders accept new notes aggregating $50,000 maturing August 21, 1951, and bearing interest at the rate of 5% per year in exchange for their demand notes of like amount;

(2) Petitioner, Locomotive and Carr agree with respect to all of petitioner's notes owned by these two stockholders (aggregating $155,556) that:

(a) interest on such notes be paid quarterly only to the extent permitted by petitioner's earnings for the preceding quarter after payment of principal and interest installments on the Bank loan, reserves for payments due Knight Associates and Wilkins under their contract and reserves for federal income taxes; and

(b) no payments of interest be made on such notes unless at the time such payments were due petitioner's ratio of current assets to current liabilities exceeded 1.5 to 1 and its working capital exceeded $45,000.

Notes issued by petitioner to its three stockholders in the principal amount of

1. Which we have slightly amplified.

$50,000 (replacing the demand notes in the same principal amount), were dated June 15, 1949, were due August 21, 1951, bore interest at the rate of 5% per year, and contained confession of judgment clauses.

Petitioner paid when due all of the interest on all of its notes owned by its stockholders from the dates of issuance through the dates of cancellation of the notes.

In May of 1950, petitioner's credit position with respect to operating expenses was good; it was discounting all of its bills for operating expenses.

Chrysler Corporation was a major customer of petitioner. In the spring of 1950, Chrysler asked petitioner to make a proposal under which it would furnish about half of the torque converter casting requirements for all of Chrysler's automobile lines. This business would have represented a large increase over any volume of business which petitioner had been doing or was capable of financing at that time.

Petitioner estimated that, to handle the business, it would require new equipment costing $150,000 to $200,000, plus a substantial amount of additional working capital. Knight concluded, however, and told Carr, that petitioner had to make the requested proposal to Chrysler and had to be prepared to make the necessary additional expenditures.

Carr informed Knight that, because of the pending liquidation of Locomotive and of Carr's desire to withdraw from active business participation, petitioner's stockholders could not make available the money needed for the Chrysler expansion.

Knight responded by offering to purchase for about $90,000 the stock and notes of petitioner then owned by Locomotive and to allow Carr and his niece's Trust to maintain their respective equity interests in petitioner if they would exchange their notes for common stock of petitioner. Locomotive, Carr and the Trust rejected Knight's offer, but offered to sell to Knight for $150,000 all of petitioner's stock and all of petitioner's notes, except for the note owned by the Bank. Knight accepted.

Knight was not in a position to make the purchase alone. He therefore invited several persons to participate with him.

On or about May 18, 1950, Locomotive, Carr and the Trust sold to the group represented by Knight (the "Knight Group") for $150,000: (1) all of petitioner's outstanding capital stock, consisting of 1,142 shares of class A stock, par value $66 per share, and 1,566 shares of common stock, without par value; and (2) their $200,000 principal amount of petitioner's notes; and the Knight Group amended petitioner's articles of incorporation to increase and change the authorized capital stock from 5,000 shares of common stock, without par value, and 1,500 shares of class A stock, par value $66 per share, to 10,000 shares of common stock, without par value, and to change petitioner's outstanding 1,566 shares of common stock and 1,142 shares of class A stock into 1,500 shares of the common stock. No change was made in petitioner's stated capital account, which from 1946 through 1955 carried a balance of $130,474.04.

About July 1, 1950, the Knight Group exchanged petitioner's 1946 notes which it now owned for petitioner's 5% Income Notes, dated July 1, 1950, in the same principal amount ($200,000) as that of the notes exchanged. The deductibility of the interest paid by petitioner on these 5% Income Notes is the issue in this case.

At the time that the 5% Income Notes were formulated and issued, petitioner believed that it might be called upon to produce the large volume of casting requirements for Chrysler, and the Bank's loan to petitioner was still outstanding.

The 5% Income Notes provide that interest becomes due only if petitioner's net working capital as of December 31 of each year is not less than $50,000. This provision carries over in substance the requirement imposed by the Bank and RFC in 1949 (and still in force when the 5% Income Notes were issued) with

respect to more than 75%—$155,556 out of $200,000—of the principal amount of petitioner's 1946 notes which were replaced by the 5% Income Notes. The only difference in this regard between the 5% Income Notes and more than 75% of the principal amount of the 1946 notes which they replaced is that under the replaced notes, petitioner's working capital had to be at least $45,000, while under the 5% Income Notes it must be at least $50,000.

The latter notes provide that interest becomes due only if petitioner's ratio of current assets to current liabilities as of December 31 of each year is not less than 1.5 to 1. This is an exact carry-over of the requirement imposed by the Bank and RFC in 1949 (and still in force when the 5% Income Notes were issued) with respect to more than 75% of the principal amount of the 1946 notes which were replaced by the 5% Income Notes.

The 5% Income Notes provide that interest becomes due only if petitioner's "available net income" is sufficient to pay all of the interest due on the aggregate amount of said notes then outstanding. "Available net income" is defined by the 5% Income Notes as follows:

(1) The net income of the Corporation for such year shall be computed, on the accrual basis without regard to interest on the Notes in accordance with accepted principles of accounting by the certified public accountants employed by the Corporation to examine the books of account of the Corporation for such year, by deducting from the total net sales and other income of the Corporation:

(a) all costs of goods sold, including royalties;

(b) all general operating expenses, including engineering and profit sharing expense; and

(c) all other proper deductions from income, including particularly but not exclusively:

(i) current maintenance and repair;

(ii) rentals;

(iii) insurance;

(iv) pensions;

(v) all charges or provisions for depreciation, retirements, renewals, replacements and amortization;

(vi) all reserves reasonably established by the Board of Directors for working capital, contingencies, improvements, acquisition or construction of buildings, machinery or equipment, or for any other reasonable and customary purpose;

(vii) all charges or provisions for federal, state and local taxes, paid or accrued, and interest and penalties thereon; and

(viii) interest, paid or accrued, other than interest on the Notes, and

(2) such net income so computed for such year, if any, shall be increased to reflect any reduction in taxes which would result from the payment of interest on the Notes with respect to such year.

The restriction on interest payments imposed by the Bank and RFC in 1949 (and still in force when the 5% Income Notes were issued) upon more than 75% of the principal amount of petitioner's 1946 notes which were replaced by the 5% Income Notes provided that interest became due only to the extent permitted by petitioner's earnings after the deduction of certain reserves.

If the tests set up by the 5% Income Notes for the payment of interest are not met in a particular calendar year, unpaid interest for such year does not accumulate. The 5% Income Notes contain this provision because, when they were issued, petitioner believed that it would be required to raise large amounts of additional capital from outside sources in order to undertake the Chrysler contract. Petitioner feared that the possible existence of unpaid, past due interest on its books of account would be a severe handicap to its attempts to borrow additional capital funds.

The 5% Income Notes are due on or before January 1, 1971, while the notes which the 5% Income Notes replaced were due August 21, 1951.

The 5% Income Notes provide that: "All rights of the holder of this Note, except the rights to receive interest as herein provided, prepayments of principal if and when justified in the opinion of the Board of Directors by the financial condition of the Corporation, and payment of the unpaid balance, if any, of the principal hereof on January 1, 1971, shall be subordinate to the rights of all other creditors of the Corporation for any and all indebtedness of the Corporation now existing or hereafter incurred."

The issuance of the 5% Income Notes in exchange for the 1946 notes which they replaced and the simplification of petitioner's capital stock were authorized by a formal "Consent of Shareholders" entered into as of May 18, 1950, under Section 147 of the Illinois Business Corporation Act[1] (which provides for unanimous consents of shareholders in lieu of meetings of shareholders and which gives such consents the same effect as a unanimous vote of shareholders).

The 5% Income Notes from the time of their issuance and all through the taxable years here involved have been carried on petitioner's books of account as "Notes Payable." Petitioner has paid the full interest on the 5% Income Notes each year since they were issued.

In addition to the foregoing facts, it appears from the record that by an agreement dated July 1, 1950, between the Knight Group and petitioner, it was agreed that the notes could not be separated from the stock, which caused the Tax Court to say that the right to participate in shareholder functions is an indication of equity ownership rather than debt.

Five of the purchasers testified that they would not have purchased these notes alone without also purchasing the equity interest. Witness Schmidt said "we are not in the business of buying long term notes even at a discount. Our business is buying for capital gains when we make an investment in a firm. * * We were buying both as a unit * * *." Knight, who represented the purchasers of 67 percent of the stock and notes, said that the notes alone "wouldn't have been the kind of investment for my company to make". According to his testimony, he wanted to obtain control of the corporation. While we shall not burden this opinion with a detailed reference to the testimony of all of these purchaser witnesses, we find that their testimony was of a nature similar to that of Schmidt and Knight.

From an examination of the entire record we hold that there is substantial evidence to support the Tax Court's finding. Particularly pertinent is the statement of the court in United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150:

"Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them. * * *"

Seldom is there a case where the bar to our upsetting the findings of fact of a court would apply more fittingly than here. Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. rule 52(a).

The nine purchasers representing the Knight Group owned all the stock and all the 5% Income Notes of petitioner. Furthermore, both the stock and notes were held by each holder in the same proportion as each individual stock investment bore to the total amount invested in the stock. Proportionate holding of stock and notes indicates a shareholder relationship. Arlington Park Jockey Club, Inc., v. Sauber, 7 Cir., 262 F.2d 902, 906. Not only were the shareholders and 5% Income Note creditors identical, but by

1. Ill.Rev.Stat.1961, c. 32, § 157.147

the terms of the July 1, 1950 shareholders' agreement, the notes could not be separated from the stock. Because of this lock-in feature, the Tax Court correctly found that it would be impossible at any time for the interests of the noteholders' group to differ from those of the shareholders.

In so holding we are approving the determination made by the Tax Court which is to be distinguished from its finding of evidentiary facts. We do so because we are confirmed in our conclusion that primary weight in this area must be given to the conclusions of the Tax Court, as the trier of fact. Commissioner v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 4 L.Ed.2d 1218; and Ortmayer v. C. I. R., 7 Cir., 265 F.2d 848, 854. Accordingly we hold that the Tax Court reached the correct result on the basis of its findings.

These noteholders were investors, not creditors.

For these reasons the decision of the Tax Court is affirmed.

Decision affirmed.

DUFFY, J., concurs in the result.