Schine Chain Theatres, Inc. v. Commissioner.
Schine Chain Theatres, Inc. v. Commissioner
Docket No. 88226.
United States Tax Court
T.C. Memo 1963-106; 1963 Tax Ct. Memo LEXIS 238; 22 T.C.M. (CCH) 488; T.C.M. (RIA) 63106; April 12, 1963
*238 Held, that advances made by petitioner to a corporation in which it owned the controlling interest constituted contributions to capital and did not give rise to bona fide indebtedness on which a deduction for a partially worthless debt can be taken under sec. 166(a)(2), 1954 Code. John W. Hughes, Esq., 105 W. Adams St., Chicago, Ill., for the petitioner. Colin C. MacDonald, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined an income tax deficiency of $128,553.91, for petitioner's fiscal year ended August 31, 1955. Part of the deficiency results from respondent's disallowance of a deduction *239 of $591,603.68 for a partially worthless debt under section 166(a)(2), 1954 Code. The chief question is whether cash advances of petitioner to Patroon Broadcasting Co., Inc., in which petitioner is the controlling shareholder, constituted loans or contributions to capital. Findings of Fact The stipulated facts are so found, and are incorporated herein by this reference. Petitioner filed a consolidated return for itself and subsidiaries with the district director of internal revenue in Albany, New York. Petitioner, a New York corporation having its principal office in Gloversville, New York, keeps its books and files its returns on the basis of a fiscal year beginning on September 1 and ending on August 31, under an accrual method of accounting. It is the parent corporation of about 112 subsidiary corporations, incorporated in various states, which are engaged in theatre, hotel, and related businesses. J. Myer Schine is the president of petitioner. Patroon Broadcasting Co., Inc., a New York corporation which originally had its principal office in Albany, New York, keeps its books and files its returns under an accrual method of accounting. Prior to 1950, Patroon filed its *240 returns on the basis of a fiscal year beginning on February 1st and ending on January 31st. It received permission to change to a calendar year basis of filing its returns, and filed a return for the period of February 1 through December 31, 1949; thereafter it filed its returns on a calendar year basis. Patroon was organized on February 2, 1946, by a group of individuals in Albany and the vicinity, who had no connection with petitioner, for the purpose of constructing and operating a radio broadcasting station and carrying on a general broadcasting business serving the area of Albany, Troy, and Schenectady. Its president was Edward M. Toole. Petitioner was not an original shareholder. Patroon's original authorized capital stock was $102,000 consisting of 1,000 shares of nonvoting, cumulative, $7 preferred stock, of a par value of $100 per share, and 2,000 shares of voting common stock of a par value of $1 per share. The holders of the preferred stock are entitled to receive dividends of $7 per share per year before any dividends are declared and paid on the common stock, which are cumulative, and to receive upon dissolution or liquidation, before any distribution to the common *241 stock shareholders, all accrued and unpaid dividends, and $100 per share. All of Patroon's capital stock was issued. There were 14 shareholders originally. Patroon received $100,000 for all of the issued preferred stock, and $1,500 for 1,500 shares of common stock. Four individuals received 500 shares of common stock ( $500 par value) in consideration for services rendered. Patroon began business, therefore, with paid in capital of $101,500, which it deposited in the State Bank of Albany. On March 8, 1946, Patroon filed an application with the Federal Communications Commission (FCC) for a permit to construct near Albany a standard radio broadcast station to be operated on power of 10,000 watts, or 10 kilowatts. In the application, Patroon submitted required financial data; it estimated that the initial cost of constructing and installing the broadcast station would be $79,514; that the estimated monthly revenues would be $12,000; that the estimated monthly cost of operation would be $9,700; and that its financial position assured $101,500, in bank. The State Bank of Albany advised FCC that Patroon had not applied for credit but a reasonable amount of credit could be arranged, if *242 needed. According to FCC regulations, the construction cost of a 10 kilowatt broadcasting station in 1946 was about $65,000. Based on its original application, which had not been amended, FCC granted Patroon a 10 kilowatt radio station construction permit, dated July 21, 1947, on frequency 1540, as requested, with the call letters WPTR. Thereafter, FCC granted Patroon an extension of time, until September 20, 1947, within which to commence construction of the station. Soon after receiving the construction permit, Patroon's stockholders learned that FCC had unexpectedly authorized two additional radio facilities and was considering granting an application for a third one for the Albany area. All would be competitors. They had not expected the authorization of additional broadcasting stations in the area and were unwilling to undertake the construction of a station with such prospective competition. Therefore, on August 18, 1947, ten of the stockholders entered into an agreement appointing an agent to sell their stock, 1,000 shares of preferred and 1,500 shares of common, subject to approval by FCC. The remaining four stockholders, who had received 500 shares of common stock for *243 services rendered, did not join in the agreement and intended to retain their stock. One of them, Harold E. Blodgett, owning 200 shares of common stock, was appointed the agent of the majority stockholders. They offered their stock for what they had paid. On September 12, 1947, petitioner entered into an agreement to purchase all of the preferred stock (1,000 shares), and 1,100 shares of common stock from the ten shareholders for $101,100. Under the same agreement, Blodgett agreed to purchase 400 shares of common stock for $400 from all or some of those who were parties to the agreement. The agreement was entered into subject to the condition that FCC would consent to the transfer of the stock and the control of Patroon. On September 19, 1947, Blodgett, as agent, filed application for such consent with FCC. On January 13, 1948, FCC gave its consent. In due course, petitioner purchased from the old stockholders 1,000 shares of preferred stock for $100,000, and 1,100 shares of common stock for $1,100, total $101,100; and Blodgett purchased 400 shares of common stock for $400. The stockholders of Patroon and the shares of stock owned by them then were as follows: Com-
Preferred
mon
Stock
Stock
Shareholders
Shares
Shares
Paid
Schine Chain Theatres,
Inc.
1,000
1,100
$101,100
Harold E. Blodgett
0
400
400
Harold E. Blodgett
0
200
Services
L. L. Asch
0
200
Services
William R. David
0
50
Services
M. L. Prescott
0
50
Services
Total
1,000
2,000
$101,500
*244 Petitioner acquired the majority of the voting common stock, 55 percent; Blodgett held 30 percent; and three other of the original stockholders owned 15 percent. Between February 20, 1946, and August 22, 1947, before the execution of the contract with petitioner, Patroon had proceeded with preparations for the construction of the broadcasting transmitter and the purchase of land where the transmitter was to be constructed; it had placed orders under contracts with Radio Corporation of America for equipment; it had received bids for other equipment; and it had obtained engineering services. Out of the $101,500 paid in for the original issuance of its stock, Patroon's total payments for the above and for organization, legal, and general expenses were $14,283.24, leaving a balance of cash in bank of $87,216.76. Included in such payments were the following: $5,075.59 to Radio Corporation of America as down payment on equipment; $1,000 on the purchase price of the real estate; $8,207.65 for organization, legal and organization services. As of August 22, 1947, it had accounts payable of $3,295.06. As of September 12, 1947, Patroon had on deposit with the State Bank of Albany $88,216.76. *245 The agreement of September 12, 1947, between petitioner and the controlling stockholders of Patroon, also provided, inter alia, as follows: That the charter of Patroon would be amended to provide for an increase of the preferred stock by 400 shares, to 1,400 shares; that petitioner would purchase the additional preferred stock at its par value of $100 per share for $40,000; and that such increased capitalization of Patroon was for the purpose of providing the additional funds necessary to complete the construction of the broadcasting station over and above the funds acquired from the original issuance of the stock. Patroon's charter was amended, but the increase which was authorized was from 1,000 to 4,000 shares of $100 par value preferred stock. Petitioner purchased 400 shares of the new preferred stock from Patroon for $40,000. Petitioner's investment in Patroon's stock then was $141,100; $140,000 for 1,400 shares of preferred stock, and $1,100 for 1,000 shares of common stock. After the issuance of the new preferred stock, Patroon's paid in capital was $142,000, consisting of $140,000 preferred stock and $2,000 common stock. There remained unissued, 2,600 shares of authorized *246 preferred stock. Under the agreement of September 12, 1947, it was agreed that in the event that during the first year of the operation of the station, WPTR, Patroon's receipts from the operations were less than the operating costs, petitioner would loan funds to Patroon from time to time to meet its current operating expenses in such amounts as would be necessary to make up the operating deficit, not to exceed the total sum of $50,000, as and when so requested by Patroon's board of directors, provided FCC issued a license to operate the station after required tests. It was further agreed that * * * All such loans shall constitute a first charge against the assets of Patroon and shall be repaid to the Purchaser [the petitioner] prior to any distribution of any of the capital or surplus of Patroon by way of dividends or otherwise, and prior to the payment of any other obligation of Patroon except actual and current operating expense. As of February 3, 1948, the chief officers of Patroon were: J. Myer Schine, president (also petitioner's president); Harold E. Blodgett, vice president; Willard S. McKay, secretary; and Louis W. Schine, treasurer; John A. May, assistant secretary *247 and treasurer. The board of directors included all of above officers and E. D. Leishman and Leonard L. Asch. Patroon began construction of the station on September 20, 1947, and completed it on July 20, 1948. The station commenced broadcasting operations in August 1948. It was then not affiliated with any network system. Patroon immediately discovered unforeseen technical difficulties. The actual, measured, ground conductivity was 1.5 to 3.5 as opposed to ground conductivity of 4, 5, or 6 which was expected and outlined on FCC charts and maps. Performance tests showed that with 10 kilowatts power, the intensity level of the signal output of the station was not strong enough, the station could not be heard in Albany, and it could not achieve the pattern prescribed by FCC. The chief cause of the problem was found to be a sand bar in Albany. Because of these difficulties, the station was unable to qualify for a broadcast license under FCC requirements. In order to correct the deficiencies of the station and obtain a license from FCC, it was necessary for Patroon to increase the power from 10 to 50 kilowatts. The directors of Patroon, at a meeting on July 1, 1948, received a report *248 showing that the estimated cost of making the improvements would be about $150,000. The directors at this meeting, presided over by the president, J. Myer Schine, gave their authorization for applying to FCC for its consent to increase the power to 50 kilowatts. On July 28, 1948, Patroon made application to FCC for the broadcast license, to which it attached a statement of its financial condition as of July 21, 1948, as follows: ASSETS
Cash
$1,718.97
Accounts receivable
245.04
Total Current Assets
$ 1,964.01
Investments - Broadcast: Land
$ 7,780.00
Studio
1,490.55
Transmitter building
14,149.59
Transmitter equipment
55,547.44
Antenna equipment
52,886.12
Studio Tech. equip.
9,179.55
Studio furn. & fixts
7,756.95
Office furn. & fixts
4,333.11
Automobile
2,895.00
$156,018.31
Total Assets
$157,982.32
LIABILITIES
Notes and acc'ts payable
$28,800.00
Taxes, misc., accrued
1,155.97
Current Liabilities
$ 29,955.97
Advances from stockholders
18,500.00
Capital: Capital stock
$142,000.00
Earned surplus (loss)
(32,473.65)
109,526.35
Total Liabilities
$157,982.32
It was also stated in the license application *249 that "Additional financing for operation [was] available through stockholders loans in accordance with File BTC-573." As of July 21, 1948, Patroon's condition was as follows: Since the time of its organization in 1946, its primary activities involved the construction of a radio station, the cost of which, plus various equipment and fixtures, was (per books) $156,018.31, which exceeded its paid-in capital of $142,000. It had accumulated losses of $32,473.65; it had received cash advances from petitioner of $18,500; it had cash on hand of $1,718.97. Also, Patroon had learned that it would be necessary to increase the power of the station to 50 kilowatts which would require additional expenditures estimated at $150,000. Later, in March 1949, Patroon's directors were advised that the cost of the additional installations would be $153,427, that credits for trade-ins of equipment would amount to $32,500, and that the net cost would be $120,927. Patroon applied to FCC for a permit to increase the power of the station to 50 kilowatts. The application was granted; the additional construction was completed at some time in 1950; the station then achieved the broadcast pattern prescribed *250 by FCC. Beginning on July 14, 1948, and continuing thereafter for several years, petitioner made cash advances to Patroon. For several years, the advances were made substantially on a weekly basis. Petitioner continued making such advances through March 5, 1957. During the years 1946 through 1956, Patroon's operations were carried on at a loss. As of December 31, 1955, according to the balance sheet in its 1955 return, Patroon's accumulated deficit amounted to $1,283,875.95. As of the end of 1956, it amounted to $1,356,565.86. The advances of petitioner to Patroon were in amounts ranging from a low of $500 to a high of $30,000. Paragraph 7 of the original stipulation of facts, setting forth the date and amount of each advance from July 14, 1948, through February 28, 1955, is incorporated herein by this reference. The following schedule sets forth by months and years, the amounts of petitioner's advances to Patroon; they totaled $861,432.78: Monthly
Cash Advances of Petitioner to Patroon: Totals
1948
1949
1950
1951
Jan.
$ 12,500
$ 17,000.00
$ 14,629.37
Feb.
25,000
23,500.00
11,900.00
Mar.
26,000
14,046.88
9,111.11
April
35,000
17,000.00
10,353.33
May
50,000
9,000.00
14,000.00
June
26,500
13,076.80
12,166.67
July
$ 28,500
29,000
13,000.00
9,500.00
Aug.
30,000
14,000
16,750.00
10,500.00
Sept.
25,000
29,000
13,876.81
8,000.00
Oct.
45,000
20,500
16,500.00
12,500.00
Nov.
15,000
13,500
13,000.00
9,000.00
Dec.
16,000
16,000
9,805.73
9,500.00
Total
$159,500
$297,000
$176,556.22
$131,160.48
*251 Monthly
Cash Advances of Petitioner to Patroon: Totals
1952
1953
1954
1955
Jan.
$ 8,000
$1,000
Feb.
3,500
2,000
$2,216.08
Mar.
3,000
$ 5,000
2,500
April
12,000
May
4,500
5,000
June
2,500
5,000
July
5,000
Aug.
8,000
10,000
Sept.
3,500
Oct.
6,500
Nov.
3,000
Dec.
5,000
Total
$64,500
$25,000
$5,500
$2,216.08
Patroon did not make any repayments of advances to petitioner until 1954 and 1955, when it repaid $17,449.11, and $7,500, respectively. After these credits to Patroon's running account on petitioner's books, the net amount of petitioner's advances as of February 28, 1955, was $836,483.67, as follows: Total Ad-
Repay-
Year
vanced
ments
1948
$159,500.00
1949
297,000.00
1950
176,556.22
1951
131,160.48
1952
64,500.00
1953
25,000.00
1954
5,500.00
$17,449.11
1955
2,216.08
7,500.00
$861,432.78
$24,949.11
Less
24,949.11
Net Advanced
$836,483.67
During the years 1948-1955, inclusive, Patroon did not pay any interest on the advances to petitioner. In addition to the above advances, petitioner advanced to Patroon the sum of $150,000 *252 on June 17, 1953, to enable Patroon to purchase a one-half interest in the assets of Champlain Valley Broadcasting Corporation under circumstances described hereinafter. This advance increased petitioner's advances to Patroon to the net amount of $986,483.67 as of February 28, 1955. Patroon had not made any repayment to petitioner with respect to the advance of $150,000 as of the latter date; nor had it paid any interest thereon. Exclusive of Patroon's repayments in 1954 and 1955 ($24,949.11), the total amount of petitioner's advances to Patroon through February 28, 1955, was $1,011,432.78: Advances 7/14/48-2/28/55
$ 861,432.78
Advance 6/17/53
150,000.00
Total
$1,011,432.78
Less 1954, 1955 repayments
24,949.11
Net Advances, 2/28/55
$ 986,483.67
Beginning January 14, 1949, and from time to time thereafter up to February 28, 1954, Patroon issued a series of unsecured promissory notes payable to petitioner for advances which petitioner had made. The notes were demand notes, except in two instances referred to hereinafter. The notes stated that the amount payable would be paid with interest but the rate of interest was not always stated. None of the *253 notes was paid by Patroon. Periodically, Patroon would issue a new note, which would take the place of an earlier note or notes, which would be in a larger amount to cover subsequent advances of petitioner. From January 14, 1949, through January 3, 1951, Patroon issued several notes payable to petitioner. The following shows the dates, amounts, and type of the notes and the advances covered: 1. Demand note dated January 14, 1949, for $164,500, bearing 5 percent interest, covering advances by petitioner from July 14, 1948, through January 11, 1949. 2. Demand note dated January 14, 1949, for $20,000, bearing 5 percent interest, covering advances by petitioner from January 20, 1949, through February 15, 1949. 3. Two notes for $75,000, each, or $150,000, dated June 22, 1949, bearing 5 percent interest, each due 3 months later on September 22, 1949. These notes were not paid when due and were renewed until replaced. They covered petitioner's advances from February 22, 1949, through June 22, 1949. 4. A demand note dated September 8, 1950, for $462,373.68, bearing interest but rate of interest not stated. The amount of this note represented the following: (a) Petitioner's advances *254 7-14-48/1-11-49, $164,500, and replaced item No. 1, above, note dated January 14, 1949. (b) Petitioner's advances 1-20-49/2-15-49, $20,000, and replaced item No. 2 above, note dated January 14, 1949. (c) $30,000, part of the 2 notes totaling $150,000, item No. 3, above, to charge back as an indebtedness of Patroon $30,000 by which the 2 notes for $150,000 had been reduced in an unexplained way. (d) $247,873.68, petitioner's advances from 7-7-49/9-5-50. (a)
$164,500.00
(b)
20,000.00
(c)
30,000.00
(d)
247,873.68
$462,373.68
5. A demand note dated January 3, 1951, for $53,182.54, bearing interest but rate of interest not stated, covering petitioner's advances from September 12, 1950, through January 2, 1951. Patroon did not pay any of the above notes. Petitioner's advances to Patroon from July 14, 1948, through August 1951, totaled $725,216.70. Patroon issued a new demand note dated September 1, 1951, payable with interest, but the rate was not stated, in the amount of $725,216.70. It replaced the prior notes then outstanding payable to petitioner, set forth below, plus advances of petitioner in the amount of $89,660.48, from January 5, 1951, through *255 August 31, 1951: (a) Note dated Sept. 8, 1950
$462,373.68
(b) Note dated Jan. 3, 1951
53,182.54
(c) Two notes dated June 22,
1949, adjusted to
120,000.00
$635,556.22
(d) Current advances
89,660.48
$725,216.70
Patroon issued another demand note dated December 31, 1951, for $39,000, covering advances of petitioner from September 1, 1951, through December 31, 1951, bearing interest, but not stating the rate of interest. Patroon issued another demand note dated August 31, 1952, for $46,500, covering petitioner's advances from January 1, 1952, through August 31, 1952. On this note, there is no promise to pay any interest. The 3 notes referred to above totaled $810,716.70. Patroon did not pay these notes or any interest thereon. They remained outstanding until February 28, 1953, when they were replaced by a new demand note dated February 28, 1953, bearing 4 percent interest, payable at The First National Bank of Boston in the amount of $937,879.11. This note replaced the 3 above notes; it covered additional advances of petitioner in the amount of $18,000 from September 1, 1952, through December 31, 1952; it also included accrued interest in the *256 amount of $109,162.41. The record does not provide an explanation of Patroon's computation of this amount of accrued interest, other than what is shown in the balance sheets contained in Patroon's income tax returns. In other words, this note covered petitioner's advances from July 14, 1948, through December 31, 1952, plus accrued interest, as follows: Advances of petitioner
7-14-48/12-31-52
$828,716.70
Accrued interest
109,162.41
$937,879.11
Petitioner advanced $25,000 to Patroon in 1953, and $1,000 on January 21, 1954, $26,000. Patroon issued a demand note payable to petitioner for $26,000, dated February 28, 1954, stating that it was payable with interest but omitting the rate of interest. On June 18, 1953, Patroon issued a demand note payable to petitioner in the amount of $150,000, payable with 6 percent interest. This note evidenced the advance of petitioner on June 17, 1953, for Patroon's use in the transaction to acquire assets of Champlain Broadcasting Corporation. As of May 23, 1955, there were outstanding and unpaid 3 demand notes of Patroon for $937,879.11, $26,000, and $150,000. These covered the advances of petitioner from July 14, 1948, through *257 January 21, 1954, in the amount of $1,004,716.70, exclusive of $109,162.41 interest, as follows: Advances 7-14-48/12-31-52
$ 828,716.70
Advances 1-1-53/2-1-54
26,000.00
Advance 6-17-53
150,000.00
$1,004,716.70 As of May 23, 1955, Patroon had not made any payment of interest on any of petitioner's advances. In 1954 and 1955, petitioner made additional advances to Patroon, which were not covered by a note, totaling $6,716.08, as follows: Feb. 26, 1954
$2,000.00
Mar. 2, 1954
2,500.00
Feb. 28, 1955
2,216.08
$6,716.08
As of February 28 and May 23, 1955, as shown hereinbefore, the total advances of petitioner amounted to $1,011,432.78, and the net amount shown in a running account with Patroon was $986,483.67, as follows, exclusive of interest: Advances covered by notes
$1,004,716.70
Advances not covered by notes
6,716.08
$1,011,432.78
Less credits 1954, 1955
24,949.11
Net Advances
$ 986,483.67
In its income tax returns for the years 1949 through 1952, Patroon reported accrued interest in the balance sheet part of each return. The interest accrued during each year and the balance shown *258 for accrued interest at the end of each year were as follows: End of Year
Year
Accrued
Accrued Balance
1949
$ 14,665.24
$ 14,665.24
1950
20,575.76
35,241.00
1951
33,966.89
69,207.89
1952
39,954.52
109,162.41
$109,162.41 During the years 1949 through 1952, such accruals reported in the returns totaled $109,162.41, which is the amount of accrued interest which Patroon included in its demand note payable to petitioner for $937,879.11, dated February 28, 1953. Petitioner did not accrue on its books and records any interest receivable from Patroon with respect to any of petitioner's advances or Patroon's notes; petitioner did not accrue on its books as interest receivable from Patroon the sum of $109,162.41, or any other amount. In the balance sheets in the income tax returns of Patroon, for the years 1948 through 1956, Patroon included in liabilities under "Bonds, notes, and mortgages payable (maturing less than one year from date of balance sheet)," an amount representing the cumulative total at the end of each year of the advances of petitioner. On June 5, 1953, Patroon entered into a contract with 3 broadcasting corporations, *259 Champlain Valley, Van Curler, and Troy, under which it agreed, inter alia, to purchase an undivided one-half interest in the assets of Champlain for $150,000. On June 17, 1953, petitioner advanced to Patroon the above sum; and Patroon gave petitioner its demand 6 percent note dated June 18, 1953, for $150,000, which has been referred to above. On June 18, 1953, petitioner borrowed $210,000 on its 5 percent demand notes from The First National Bank of Boston, out of which it repaid itself $150,000. Petitioner endorsed in blank the note of Patroon in that amount and pledged it to The First National Bank of Boston in further security for the loan of $210,000. By August 16, 1954, all of the assets of Champlain were sold (most were sold for scrap), and Patroon received its share of the proceeds in the amount of $17,449.11, which amount (as previously stated) was paid over to petitioner, for which Patroon received credit against petitioner's advances. The circumstances leading to the contract of June 5, 1953, were as follows: Champlain had received a construction permit from FCC to build a radio broadcasting station and was engaged in the operation thereof, station WXKW in Albany; *260 but it had not yet received an FCC license because it had encountered technical difficulties. Also, both Champlain and Van Curler had filed separate and competing applications with FCC for a permit for a television station on channel 35 in Schenectady; and Patroon and Troy had filed competing and separate applications with FCC for a television station on channel 23 in Albany and Troy. FCC had advised each pair of competing applicants that comparative hearings would be necessary. Under all of the circumstances, Champlain desired to abandon its applications for a radio license and a television permit provided its stockholders would receive some return on their investments and to that end, Champlain was willing to sell its assets. It was agreed that Champlain would receive $300,000 for all of its assets; that Patroon would pay $150,000 for a 50 percent interest in the assets; and that Van Curler and Troy, each, would pay $75,000 for a 25 percent interest. It was further agreed that Troy would give up its application for a television station on channel 23, leaving Patroon the sole applicant for that channel; and that Troy would join in the Van Curler application for channel 35. The assets *261 of Champlain were purchased. However, the purchasers did not intend to operate radio station WXKW because of the technical difficulties and for other reasons. Champlain surrendered the permit to operate station WXKW, and the purchasers did not apply for a permit to operate that radio station. They decided to liquidate and sell the assets purchased from Champlain because a purchaser for station WXKW was not available. Most of the assets were sold for their scrap value in 1954. FCC regulations prohibited Patroon's operation of two radio stations in the same market. In its income tax return for 1953, Patroon reported an increase in "Other Assets" in the amount of $150,000, reflecting its investment in the assets of Champlain. It also carried on its books under "Other Assets" its application for a television permit. In its return for 1954, Patroon reported and deducted a loss from the liquidation of the business of radio station WXKW in the amount of $121,918.39. In 1954, Patroon decided not to build a television station using channel 23. The following schedule sets forth Patroon's financial condition as reported in its income tax returns for its fiscal year ending January 31, 1949 (shown *262 as 1948), and the calendar years 1949 through 1955, i.e., gross receipts and net loss for each year, and the accumulated deficit as of the end of each year: Patroon
Patroon
Patroon Ac-
Gross
Net
cumulated
Year
Receipts
Losses
Deficit
1948 [1]
$130,183.01
$ 140,335.04
1949 [2]
$ 57,634.94
181,510.14
321,845.18
1950 [3]
79,335.63
208,540.90
530,386.08
1951
$119,148.31
$193,792.30
$ 729,178.38
1952
197,537.61
113,884.34
843,147.72
1953
207,644.41
114,036.65
956,416.91
1954
202,914.04
199,614.02
1,155,211.53
1955
200,544.90
128,794.42
1,283,875.95 The following schedule sets forth the total amount advanced by petitioner to Patroon during each calendar year 1948-1954, inclusive, and through February 1955, exclusive of the small repayments of Patroon in 1954 and 1955; and the accumulated amounts of the advances as of the end of each year through February 1955: Annual
Cumulative Amount
Advances
Advanced as of
Year
to Patroon
End of Periods
1948
$159,500.00
$ 159,500.00
1949
297,000.00
456,500.00
1950
176,556.22
633,056.22
1951
131,160.48
764,216.70
1952
64,500.00
828,716.70
1953
175,000.00
1,003,716.70
1954
5,500.00
1,009,216.70
1955 *
2,216.08
1,011,432.78
*263 Patroon's radio station, WPTR, became an affiliated station of American Broadcasting Company on November 15, 1955. Before then, WPTR was not an affiliate of any network system. The balance sheet made part of Patroon's income tax return for the calendar year 1954 showed the following items of assets and liabilities as of December 31, 1954: ASSETS
Cash
$ 12,280.53
Notes and acc'ts rec'ble, less bad debt
24,992.70
reserve
Fixed deprec. assets
$338,362.89
Less accum. deprec.
178,037.50
160,325.39
Land
7,780.00
Other assets
14,881.56
TOTAL ASSETS
$ 220,260.18
LIABILITIES AND CAPITAL
Acc'ts payable
$ 23,376.78
Bonds, notes, etc. (maturing less than 1
1,100,930.00
yr.)
Accrued expenses
109,164.93
Capital stock: Pfd. 1 holder
$140,000.00
Common 5 holders
2,000.00
142,000.00
DEFICIT
(1,155,211.53)
$ 220,260.18
The item of accrued expenses in the above balance sheet consists of accrued payroll withholding and sundry taxes in the amount of $2,003.41, and accrued interest of $107,161.52; total, $109,164.93. At a meeting of petitioner's board of directors held on May 23, 1955, there *264 was presented to the directors the balance sheet of Patroon as of December 31, 1954, showing total assets in the amount of $220,260.18, and liabilities adjusted to $25,380.19, omitting bonds, notes, etc., maturing in less than 1 year, in the amount of $1,100,930.00, and accrued interest expense in the amount of $107,161.52, so as not to reflect any liabilities connected with petitioner's advances to Patroon; but including accrued payroll withholding and sundry taxes of $2,003.41, and a resulting figure for the net book value of Patroon's assets of $194,879.99, as set forth below. The parties have stipulated that the adjusted balance sheet accurately set forth the net book value of Patroon's assets before taking into consideration petitioner's advances to Patroon from July 14, 1948, through February 28, 1955. The abbreviated, or adjusted, balance sheet of Patroon as of December 31, 1954, was as follows: ASSETS
Cash
$ 12,280.53
Notes & acc'ts rec'ble
$ 32,192.70
Less reserve for bad debts
7,200.00
24,992.70
Fixed deprec. assets
$338,362.89
Less accum. deprec.
178,037.50
160,325.39
Land
7,780.00
Other assets: Prepaid ins.
2,188.00
Susp. Acc't T.V. Applic.
12,693.56
14,881.56
TOTAL ASSETS
$220,260.18
LIABILITIES
Accounts payable
$ 23,376.78
Accrued expenses, payroll & sundry taxes
2,003.41
Liabilities before considering Schine advances
$ 25,380.19
NET ASSETS before considering Schine advances
$194,879.99
*265 At the directors' meeting on May 23, 1955, consideration was given to the status of Patroon's note for $150,000 dated June 18, 1953. It was reported that officials of Patroon had stated that they were not in a position to repay at that time any part of the note. Accordingly, a resolution was adopted authorizing petitioner's officers to write off as a bad debt the sum of $150,000, and to make the necessary entries on petitioner's books to effect such write-off by debiting Bad Debt Expense and crediting Notes Receivable in the amount of $150,000. With respect to the net amount of petitioner's advances of $836,483.67, the directors were presented with the abbreviated balance sheet of Patroon, set forth above, showing that the net book value of Patroon's assets at the end of 1954, before taking into account petitioner's advances, was $194,879.99. The directors decided that the maximum amount which could be allowed for Patroon's intangible assets, such as its license to operate station WPTR, and possibly good will, would be $200,000, which "would make the total maximum value to be applied on the advances and loans made by this corporation [Schine Chain Theatres, Inc.] to the Patroon *266 Broadcasting Corp., the sum of $394,879.99." The directors of petitioner concluded that if the above total value ascribed to Patroon's tangible and intangible assets was to be applied to the net amount of petitioner's advances through February 28, 1955, of $836,483.67, a loss would result in the amount of $441,603.68: Petitioner's net advances
$836,483.67
Value ascribed to Patroon
394,879.99
Loss
$441,603.68 Accordingly, the directors adopted a resolution authorizing petitioner's officers to write off as a partially worthless debt the sum of $441,603.68, and to make the necessary entries on petitioner's books to effect such write-off by debiting Bad Debt Expense and crediting Notes and Accounts Receivable in the amount of $441,603.68. Petitioner was on the direct charge-off method of deducting bad debts during its fiscal taxable year ending August 31, 1955. During its fiscal year ended August 31, 1955, petitioner, on its books and records, charged off as a bad debt the entire face amount of the note of Patroon for $150,000, and also charged off as a partially worthless debt $441,603.68 of the other advances to Patroon in the net amount of $836,483.67. *267 The appropriate entires debiting Bad Debt Expense and crediting Notes Receivable and Accounts Receivable were made as authorized. In its income tax return for its fiscal year ended August 31, 1955, petitioner deducted $591,603.68, the sum of both charge-offs, and gave the following explanation: "Wholly and Partially Worthless Bad Debts - Notes Receivable from Patroon Broadcasting Co., Inc. - see schedule attached." Subsequent to May 23, 1955, when the charge-offs were authorized by the directors, petitioner continued to make advances to Patroon on an open account, as follows: $12,500 during the remainder of 1955; $44,500 during 1956; and $40,000 during the period January 1 through March 5, 1957. These advances totaled $97,000. The addition of these advances to the net total amount of petitioner's advances up to and including February 28, 1955, exclusive of the advance of $150,000 on June 17, 1953, and not taking into account the charge-off of $441,603.68, increased the net total amount of petitioner's advances to Patroon from July 14, 1848 through March 3, 1957 to $933,483.67. The following sets forth Patroon's gross receipts, net loss, and deficit for 1956, as shown by its *268 return: Gross Receipts
Loss
Deficit 12/31/56
$184,712.24
$72,771.58
$1,356,565.86
Under a contract dated March 7, 1957, petitioner purchased an additional 800 shares of the common stock of Patroon for $35,000. Beginning with petitioner's income tax return for its fiscal year ended August 31, 1957, and thereafter, petitioner has included Patroon in its consolidated returns for itself and its subsidiaries. At all times since petitioner acquired the controlling stock of Patroon, the affairs of Patroon have been controlled by petitioner through the board of directors and executive offices of Patroon on both of which a majority were individuals who were officers, directors, or employees of petitioner. Patroon has 8 directors and 8 executive offices. At all times material, at least 5 directors and 5 officers were individuals connected with petitioner. At all times material, the president of petitioner, J. Myer Schine, has been the president and a director of Patroon. At all times material since March 15, 1949, Howard M. Antevil, an attorney employed by petitioner as its "house counsel", has been the secretary and a director of Patroon; since February 3, 1948, Louis *269 W. Schine has been the treasurer and a director of Patroon; since February 3, 1948, John A. May, who is either employed by petitioner or connected with it, has been assistant treasurer and a director of Patroon, and F. D. Thompson (also known as F. D. Torrey), who is employed by or connected with petitioner, has held the office of assistant secretary and/or the office of assistant treasurer of Patroon; since July 11, 1950, G. David Schine has been a vice president and director of Patroon; since September 28, 1951, Donald G. Schine has been a director of Patroon, and on July 26, 1954, he became a vice president. At all times material, since July 11, 1950, the only officer of Patroon who was not an officer, director, or employee of petitioner is William R. David, vice president in charge of engineering, who is a minority stockholder of Patroon, owning 50 shares of common stock which he received for services rendered to Patroon; he is also a director of Patroon. At all times material, since July 14, 1953, through 1955, all of Patroon's directors, except William R. David, were officers, directors, or employees of Patroon. Under petitioner's contention that its advances to Patroon gave *270 rise to a "debt", there resulted a debt to equity ratio in the years 1948-1954, inclusive, as follows: Ratio of "Debt"
Year
to Equity
1948
1.3 to 1
1949
3.3 to 1
1950
4.4 to 1
1951
5.0 to 1
1952
6.0 to 1
1953
7.6 to 1
1954
8.0 to 1
Petitioner did not make any real or bona fide efforts to enforce the obligations evidencing the advances it had made to Patroon. Petitioner in fact did not make demands upon Patroon for payment of any of the notes outstanding on February 28, 1955, and May 23, 1955. During the period 1948 through 1954, Patroon did not have the liquid assets and working capital with which to finance the entire construction and completion of a radio broadcasting station which could meet the FCC performance requirements required as a condition of the issuance of a broadcast license, and with which to get its business established, and with which to keep its business in operation; Patroon was inadequately capitalized and could not have carried on operations without receiving the advances made by petitioner. At the time the advances here in question were made by petitioner to Patroon, it was not reasonable to expect that they would *271 be repaid in any event and unless the business of Patroon should prove to be successful and profitable. As a matter of substantial economic reality, all of the advances by petitioner to Patroon were placed at the risk of the business of Patroon, constituted risk capital, and represented contributions to capital. The advances by petitioner to Patroon did not give rise to a bona fide debt. Opinion During petitioner's fiscal year ended August 31, 1955, petitioner made two charge-offs on its books totaling $591,603.68, with respect to its advances to Patroon, and in so doing it took into account its advances during the period July 14, 1948 through February 28, 1955. Accordingly, the parties are agreed that the issue presented relates to the advances of petitioner during that period. It is also agreed that the net amount of all of the advances to and including February 28, 1955, was $986,483.67. There is no dispute about the basic facts; most of them have been stipulated. Petitioner contends that all of the advances were loans to Patroon which gave rise to a debt and that it is entitled, under section 166(a)(2) [1] of the Internal Revenue Code of 1954, to a deduction in the taxable *272 year of $591,603.68 for a partially worthless debt. Respondent's chief contention is that all of the advances represented contributions to the capital of Patroon for the purpose of establishing that corporation in its business and keeping the business in operation. Whether or not advances to a corporation constituted as a matter of practical reality (i.e., "for tax purposes") equity investment in the business of the corporation, i.e., capital contributions, or a valid indebtedness within the meaning of the Internal Revenue Code, J. A. Maurer, Inc., 30 T.C. 1273, 1289-1290, is essentially a question of fact. *273 Matthiessen v. Commissioner, 194 F. 2d 659, 661 affirming 16 T.C. 781. The petitioner has the burden of proving that its advances to Patroon constituted a debt and that it is entitled to the claimed deduction for a partially worthless debt, which the respondent disallowed. Petitioner stresses the following points: That Patroon issued demand notes bearing interest for the advances; that the advances were not made in proportion to stockholdings; and that some of the advances were repaid. These are factors to be considered in determining whether the real intention of the parties was to create a debtor-creditor relationship. But they are not conclusive. Whether or not there is a real intention to create a bona fide debt is to be determined in the light of all of the facts of a particular case. Seldom should any one element be determinative. John Kelley Co. v. Commissioner, 326 U.S. 521, 530; Gooding Amusement Co., 23 T.C. 408, 418, affirmed 236 F. 2d 159, certiorari denied 352 U.S. 1031. The form of the transaction and the taxpayer's motive are not controlling, but rather the substance. *274 Gregory v. Helvering, 293 U.S. 465; Commissioner v. Court Holding Co., 324 U.S. 331. "Where the loss sought to be regarded as a bad debt 'is as a matter of substantial economic reality a loss of risk capital', it will be disallowed." Gilbert v. Commissioner, 262 F. 2d 512, 514, affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002. In determining whether advances to a closely held corporation may properly be treated as loans for tax purposes, there are several factors to be taken into account including the use to which the funds are put, whether outside parties or institutions would make such advances under the circumstances present, and the lack of reasonable expectation of repayment. The essential characteristic of a debt is an unqualified obligation to pay in any event a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. Gregg Co. of Del. v. Commissioner, 239 F. 2d 498. On the other hand, a stockholder intends to make an investment and take the risks of the venture. *275 Commissioner v. Meridian & Thirteen R. Co., 132 F. 2d 182, 186. In Gilbert v. Commissioner, 248 F. 2d 399, remanding a Memorandum Opinion of this Court which was affirmed on the second appeal in Gilbert v. Commissioner, 262 F. 2d 512, the Court of Appeals for the Second Circuit has observed that the significant factor in determining the question involved here is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business." In this case, this factor is of particular importance as subsequent discussion will show. The facts here with respect to the advances made to Patroon are similar to the facts in a number of cases where this Court held that advances made to newly organized corporations were capital contributions and not debts. Edward G. Janeway, 2 T.C. 197, affd. 147 F. 2d 602; Sam Schnitzer, 13 T.C. 43, affd. 183 F. 2d 70, certiorari denied 340 U.S. 911; *276 Isador Dobkin, 15 T.C. 31, affd. 192 F. 2d 392; Hilbert L. Bair, 16 T.C. 90; Phil Kalech, 23 T.C. 672; Colony, Inc., 26 T.C. 30, affd. 244 F. 2d 75, reversed on another issue 357 U.S. 28; Lewis L. Culley, 29 T.C. 1076, 1086; Wilbur Security Co., 31 T.C. 938, affd. 279 F. 2d 657; Universal Castings Corporation, 37 T.C. 107, affd. 303 F. 2d 620. Patroon was organized in February 1946 with paid in capital of $101,500. Between the time of its organization and the time petitioner agreed to purchase the controlling stockholdings, September 12, 1947, Patroon had only initiated the procedures for constructing a radio broadcasting station, in the course of which it had spent around $13,000, net, and it had the remaining capital of about $88,215. Patroon had not yet acquired its chief asset and had not become established in business. Petitioner purchased all of the preferred and 55 percent of the common stock from the original stockholders for what they had paid. Petitioner became the controlling stockholder; there were 4 individual *277 minority stockholders, Blodgett, Asch, Prescott, and David who held 900 shares of common stock, of which 500 shares had been received for services rendered. When petitioner contracted to purchase stock, it was fully aware that Patroon would require additional funds, and accordingly petitioner paid Patroon $40,000 for 400 shares of additional preferred stock and agreed to "loan" Patroon funds, from time to time, to meet its current operating expenses if it had an operating deficit; i.e., to advance working capital. The other stockholders did not agree to make advances and did not make any. From the outset, Patroon required substantial amounts, far in excess of the $40,000 petitioner paid for additional preferred stock, with which to complete the satisfactory construction of its chief asset, and it sustained substantial net operating losses beginning in 1946 and continuing throughout the succeeding years through 1955, which served to create a deficit at the end of 1954 of $1,155,211.53. Thus, petitioner advanced far more than the $50,000 which it agreed to "loan" Patroon in September 1947. In fact, from July 14, 1948, through February 1955, petitioner's total advances were $1,011,432.78. *278 Of that amount, around $120,000, at least, was used by Patroon for the construction of its station, a capital use; and $150,000 was used by Patroon in acquiring a 50 percent interest in the assets of a competitor, Champlain, which Patroon and its associates did not intend operating. This latter expenditure, as far as the record shows, can only be regarded as a capital expenditure. Roughly, petitioner advanced Patroon $885,211, and not more than that, in order to enable it to become established in a business and keep the business in operation. Patroon during this period, from the time petitioner became the controlling stockholder, did not have sufficient capital to construct its station or liquid assets or working capital to establish itself in business and continue in business. Moreover, petitioner, through its majority stockholdings, controlled the financial and administrative operations of Patroon; and the majority of the officers and directors of Patroon were individuals who were also officers, directors, and employees of petitioner. Patroon was unable to make any repayments to petitioner during or at the end of each of the years 1948 through 1953, and did not pay any interest. *279 Petitioner was compelled, from 1948 forward, to make advances for capital assets and to meet current operating expenses, in order that Patroon could continue to keep its FCC licenses, and petitioner made weekly advances of funds during several years with full knowledge of the increasingly large amount of its advances and Patroon's steadily mounting deficit. At the end of each of the years 1948 through 1954, the cumulative balances in petitioner's running account with Patroon and Patroon's deficits were as follows: Total Amounts of
Patroon's
Year
Pet's. Advances
Deficit
1948
$ 159,500.00
$ 140,335.04
1949
456,500.00
321,845.18
1950
633,056.22
530,386.08
1951
764,216.70
729,178.38
1952
828,716.70
843,147.72
1953
1,003,716.70
956,416.91
1954
991,767.59 *
1,155,211.53
The record in this case clearly shows that petitioner did not advance the funds in question "with reasonable expectations of repayment regardless of the success of the venture", and that the funds were definitely "placed at the risk of the business" of Patroon. It was evident to all parties concerned that *280 the advances were made for the purpose of financing the construction of Patroon's radio broadcasting station, establishing Patroon in the broadcasting business and keeping it in that business. Only if and when Patroon became established in and carried on a profitable business could there be repayment to petitioner of the large amounts required and furnished. One of petitioner's witnesses frankly testified that Patroon's anticipated source of repaying petitioner was solely the future profits of Patroon. Patroon's condition was typically one requiring the investment of risk capital rather than one of establishing a bona fide debtor-creditor relationship involving "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." Gilbert v. Commissioner, 248 F. 2d 399; Gregg Co. of Del. v. Commissioner, supra. The parties observed the form of a debtorcreditor relationship by Patroon's issuance of notes to petitioner covering the advances, from time to time. However, the true intent of the parties can be determined only by examination *281 of all of the circumstances existing in the relationship between the corporation making the advances and the corporation issuing the notes. Patroon's notes were unsecured demand notes; there were no fixed maturity dates. A fixed maturity date is a most significant factor toward determining the existence of a debtor-creditor relationship. Gooding Amusement Co. v. Commissioner, 236 F. 2d 159. There were no fixed dates for the payment of interest. Although Patroon accrued amounts of interest, such as the amount of $109,162.41, which Patroon included in its note of February 28, 1953, for $937,879.11, the record does not show on what basis or at what rate of interest. Furthermore, petitioner did not accrue any interest on its books at any time in respect of any of its advances. Patroon did not pay any interest. Finally, the record shows that petitioner did not make any real demand or effort to enforce payment of the notes or of interest. We cannot find from the record that petitioner ever intended to establish a bona fide debtor-creditor relationship with Patroon. It must be noted, further, that after petitioner charged off in 1955 $591,603.68 of the advances made through *282 February 1955 as a partially worthless "debt", it continued to make advances to Patroon during the succeeding two-year period which totaled $97,000 through March 2, 1957. As was observed in Dodd v. Commissioner, 298 F. 2d 570, 578, affirming a Memorandum Opinion of this Court, "It is unreasonable to conclude that, under such conditions, a prudent creditor would continue to make unsecured loans to a debtor with expectation of repayment." See, also, Wilbur Security Company v. Commissioner, 279 F. 2d 657, 662 and footnote 1 on p. 662. There is nothing in the record to indicate that Patroon made any real attempt to finance "loans" by outside lenders or lending institutions, and we observe that very few, if any, lending institutions would loan such substantial amounts as were advanced by petitioner for from 5 to 7 years on unsecured demand notes, and without requiring and receiving payments of interest on such loans during that period. Petitioner also argues that since the advances were disproportionate to its stockholdings, i.e., none of the other 4 stockholders made any advances, the advances were not capital contributions. *283 That fact was present in Phil Kalech, supra, and Colony, Inc., supra, where it was nevertheless held that advances were capital contributions. In the light of the other facts here, discussed above, and the entire record the above factor is not significant. Lewis L. Culley, supra, p. 1088. Upon consideration of the entire record and, particularly of the factors above mentioned, it is concluded that all of petitioner's advances during the period in question were in reality contributions of risk capital which were made for the primary purpose of starting and keeping going a new and under-capitalized corporation; that petitioner's expectation of recoupment was obviously based upon the ultimate success of Patroon's ventures; and that the advances did not give rise to an indebtedness of Patroon and Patroon's notes were not in reality evidence of a true debt within the meaning of the Internal Revenue Code. It follows that petitioner is not entitled to a deduction under section 166(a)(2) for a partially worthless debt and respondent properly disallowed the deduction of $591,603.68. *284 J. A. Maurer, Inc., supra; Gilbert v. Commissioner, 262 F. 2d 512, certiorari denied 359 U.S. 1002; American-La France-Foamite Corporation v. Commissioner, 284 F. 2d 723, affirming a Memorandum Opinion of this Court, certiorari denied 365 U.S. 881; Arlington Park Jockey Club v. Sauber, 262 F. 2d 902; Charter Wire, Inc. v. United States, 309 F. 2d 878, certiorari applied for February 16, 1963. Because of the conclusion reached under the chief issue, alternative questions are not reached and need not be decided. Decision will be entered for the respondent. *
Footnotes
1. Period July 14, 1948, through Jan. 31, 1949.↩
2. Period Feb. 1, 1949 through Dec. 31, 1949.↩
3. Calendar year.↩
*. Through Feb. 1955.↩
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
*. Net amount after 1954 repayments of $17,449.11.↩
*. An official order of the Tax Court, dated August 4, 1963 and signed by Judge Harron deleted the words "Although the main question is decided for the respondent, a recomputation of the deficiency under Rule 50 is required because of stipulations of the parties relating to other items. Decision will be entered under Rule 50." and substituted the present wording therefor.↩